IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
# CASE NUMBER 24-11085

UNITED STATES OF AMERICA,
*PLAINTIFF-APPELLEE.*,

V.

DOMINIC XAVIER REED,
*DEFENDANT-APPELLANT.*

ON DIRECT APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

## APPELLANT'S CORRECTED INITIAL BRIEF

JASON D. HAWKINS
FEDERAL PUBLIC DEFENDER

J. MATTHEW WRIGHT
ASSISTANT FEDERAL PUBLIC DEFENDER
600 South Taylor Street
Suite 2300
Amarillo, Texas 79101
(806) 324-2370
Matthew_Wright@fd.org

Counsel for Appellant

### Certificate of Interested Persons
### *United States v. Dominic Xavier Reed,* Case No. 24-11085

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| Appellant: | Dominic Xavier Reed |
| Defense Counsel: | Federal Public Defender for the Northern District of Texas |
| | J. Matthew Wright |
| | Andrenette Sullivan |
| | Maria Antoinette Pedraza |
| Prosecutors: | U.S. Attorney for the Northern District of Texas |
| | Stephen Gilstrap |
| | Brandie Lou Wade |
| | Matthew Robert Weybrecht |
| District Judge: | Hon. Terry R. Means |
| Magistrate Judges: | Hon. Jeffrey L. Cureton |
| | Hon. Hal R. Ray, Jr. |

*/s/ J. Matthew Wright*
Counsel for Appellant

## Statement Regarding Oral Argument

Appellant requests oral argument.

# Table of Contents

Certificate of Interested Persons .................................................................. ii

Statement Regarding Oral Argument ....................................................... iii

Table of Authorities ................................................................................ viii

Jurisdictional Statement ............................................................................ 1

Issues Presented for Review ...................................................................... 2

Statement of the Case ............................................................................... 3

    A.  The Possession .................................................................................. 3

    B.  The Firearm ...................................................................................... 5

    C.  The (Alleged) Felony Convictions .................................................. 7

        1.  The 2007 Case: Possession of Stolen Things ........................... 7

        2.  The 2009 Case: Attempted Unauthorized Entry into an Inhabited
           Dwelling ...................................................................................... 9

    D.  The Detention Hearing and Its Aftermath .................................. 12

    E.  The Pretrial and Mid-Trial Motions ............................................ 14

        1.  Mr. Reed moved to dismiss the indictment and renewed the
           motion multiple times. ............................................................. 15

        2.  Mr. Reed asked the court to exclude the 2007 Case because the
           disposition could not satisfy the definition of "conviction" found in
           18 U.S.C. § 921(a)(20) ........................................................... 17

        3.  After the government rested, Mr. Reed moved for a judgment of
           acquittal as to all elements of 18 U.S.C. § 922(g)(1) .............. 18

    F.  Jury Instructions, Note from the Jury, and Verdict ..................... 20

G.  Sentencing ................................................................. 22

Summary of the Argument .................................................... 25

Argument ................................................................... 26

I.  As a matter of law, the 2007 Stolen Things disposition cannot "be considered a conviction for purposes of" 18 U.S.C. § 921(a)(20) and § 922(g)(1). ........................................................... 26

A.  Review is *de novo*. .................................................. 27

B.  The parties proposed divergent interpretations of § 921(a)(20)'s "unless clause." The district court joined the wrong side of the debate. ............................................................. 28

1.  The district court's interpretation is inconsistent with the plain meaning of the statutory text. ............................... 31

2.  The district court's interpretation is inconsistent with binding precedent. ....................................................... 33

3.  The district court's interpretation is inconsistent with Congressional purpose. ......................................... 36

C.  If Mr. Reed was truly convicted of possessing stolen things and sentenced to two years' incarceration, then his civil rights were restored long before August 8, 2022. ............................. 37

1.  Mr. Reed would have completed a two-year sentence long before August 2022. ................................................ 39

2.  The Louisiana Constitution guarantees a generalized restoration of rights when an offender completes his sentence. .............. 41

3.  Louisiana automatically pardons all nonviolent first-time felony offenders. ...................................................... 42

4.  Louisiana automatically restores the specific right to vote when an offender satisfies a prison sentence or five years after parole begins. ....... 44

5. Before 2018, Louisiana restored the specific right to hold public office when the sentence was completed. Since 2018, that right is regained after five years..............................................................45

6. Louisiana would have automatically restored the specific right to serve on a jury by August 2021, at the latest. ...........................45

D. The Court should vacate the conviction and allow the district court to correct this error. ........................................................................47

II. The jury instructions fell short..............................................................47

A. The standard of review is de novo. ..............................................47

B. The district court should have informed the jury about the federal pardon and restoration-of-rights rule. ...........................................48

C. The district court should have instructed the jury about Louisiana's pardon and restoration rules...........................................................52

D. The court's instructions about felon status and knowledge deprived Mr. Reed of the chance to present viable *mens rea* defenses. .........53

E. The court should have told the jury about Louisiana's requirement for memorializing a judgment of conviction..................................58

III. Mr. Reed's conviction is incompatible with the Second Amendment. ...........60

A. Review is de novo. ........................................................................60

B. Felon-in-possession laws are constitutionally suspect....................60

1. Despite its young age, federal courts have often embraced the prohibition against felons possessing firearms. .........................60

2. *Bruen* breathed new life into Second Amendment challenges, and the thinking around § 922(g)(1) is unsettled............................62

C. Under the *Bruen* and *Diaz* framework, this conviction violates the Second Amendment. .....................................................................63

1. In *Diaz*, the Court upheld § 922(g)(1) when applied against someone convicted of a modern crime whose closest colonial analog was capital. ...................................................................... 63

2. At the Founding, receipt or possession of stolen items was (at most) a misdemeanor. ........................................................................ 65

3. There is no Founding-era crime analogous to attempted entry into an inhabited dwelling. .............................................................. 68

IV. Section 922(g)(1), as applied in this case, exceeds Congress's affirmative powers as originally understood. .................................... 73

Conclusion ........................................................................................ 75

Certificate of Service ....................................................................... 76

Certificate of Compliance ............................................................... 76

# Table of Authorities

**Cases**

*Alleyne v. United States,*
570 U.S. 99 (2013) ................................................................. 51

*Apprendi v. New Jersey,*
530 U.S. 466 (2000) .............................................................. 51

*Caron v. United States,*
524 U.S. 308 (1998) .........................................................*passim*

*Cherry v. State,*
306 A.2d 634 (Md. App. 1973) ............................................ 68

*Commonwealth v. Taylor,*
5 Binn. 277 (Penn. 1812) ..................................................... 70

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .............................................................. 62

*Kanter v. Barr,*
919 F.3d 437 (7th Cir. 2019) ............................................... 72

*Lewis v. United States,*
445 U.S. 55 (1980) ............................................................... 61

*New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ................................................. 62, 63, 65, 72

*People v. Goduto,*
174 N.E.2d 385 (Ill. 1961) ................................................... 69

*Rehaif v. United States,*
588 U.S. 225 (2019) ........................................................ 54, 57

*Rex. v. Higgins,*
102 Eng. Rep. 269, 2 East. 5 (1801) ..................................... 68

*Rex v. Scofield,*
    Cald. 397 (1784) ................................................................ 68

*Robertson v. Baldwin,*
    165 U.S. 275 (1897) ........................................................ 37

*Scarborough v. United States,*
    431 U.S. 563 (1977) ........................................................ 73

*Shepherd v. Schedler,*
    209 So. 3d 752 (La. 2016) ............................................. 45

*State v. Avery,*
    7 Conn. 266 (1828) ........................................................ 68

*State v. Chandler,*
    5 La. Ann. 489 (1850) ................................................... 35

*State v. Eberhardt,*
    145 So. 3d 377 (La. 2014) ....................................... 32, 33

*State v. Ferrand,*
    664 So. 2d 396 (La. 1995) ............................................. 35

*State v. Fort,*
    20 N.C. (3&4 Dev. & Bat.) 332 (1839) ..................... 70

*State v. Landry,*
    588 So. 2d 345 (La. 1991) ............................................. 32

*State v. Nelson,*
    367 So. 2d 317 (La. 1979) ............................................. 35

*State v. Sanford,*
    10 S.C.L. (1 Nott & McC.) 512 (S.C. Const. App. 1819) ................. 67

*State v. Williams,*
    366 So. 2d 1369 (La. 1978) ........................................... 32

*United States v. Anderson,*
    559 F.3d 348 (5th Cir. 2009) ........................................ 62

*United States v. Bass,*
404 U.S. 336 (1971) ............................................................ 60

*United States v. Branson,*
139 F.4th 475 (5th Cir. 2025) ............................................ 72

*United States v. Broadnax,*
601 F.3d 336 (5th Cir. 2010) ..................................... *passim*

*United States v. Darrington,*
351 F.3d 632 (5th Cir. 2003) ............................................ 62

*United States v. Daugherty,*
264 F.3d 513 (5th Cir. 2001) ...................................... 27, 52

*United States v. Diaz,*
116 F.4th 468 (5th Cir. 2024) .................................... *passim*

*United States v. Dupaquier,*
74 F.3d 615 (5th Cir. 1996) ....................................... *passim*

*United States v. Emerson,*
270 F.3d 203 (5th Cir. 2001) ...................................... 61, 62

*United States v. Everist,*
368 F.3d 517 (5th Cir. 2004) ............................................ 62

*United States v. Garcia-Gonzalez,*
714 F.3d 306 (5th Cir. 2013) ............................................ 27

*United States v. Gaudin,*
515 U.S. 506 (1995) .................................................... 51, 52

*United States v. Graves,*
554 F.2d 65 (3d Cir. 1977) ............................................... 61

*United States v. Hall,*
134 F.4th 782 (5th Cir. 2025) ...........................27, 28, 47, 48

*United States v. Hamilton,*
46 F.4th 389 (5th Cir. 2022) .............................28, 47, 48

*United States v. Harris,*
   740 F.3d 956 (5th Cir. 2014) ................................................. 47

*United States v. John,*
   309 F.3d 298 (5th Cir. 2002) ................................................. 48

*United States v. Kyllonen,*
   774 F. App'x 212 (5th Cir. 2019) ......................................... 18

*United States v. Lopez,*
   514 U.S. 549 (1995) .............................................................. 74

*United States v. Mares,*
   402 F.3d 511 (5th Cir. 2005) ................................................. 62

*United States v. Massey,*
   849 F.3d 262 (5th Cir. 2017) ................................................. 62

*United States v. Miller,*
   307 U.S. 174 (1939) .............................................................. 61

*United States v. Morrison,*
   529 U.S. 598 (2000) .............................................................. 74

*United States v. Osborne,*
   262 F.3d 486 (5th Cir. 2001) ....................................... 27, 33, 34

*United States v. Perez-Macias,*
   335 F.3d 421 (5th Cir. 2003) ................................................. 60

*United States v. Robinson,*
   982 F.3d 1181 (8th Cir. 2020) ............................................... 57

*United States v. Schnur,*
   132 F.4th 863 (5th Cir. 2025) ............................................... 72

*United States v. Scroggins,*
   599 F.3d 433 (5th Cir. 2010) ................................................. 62

*United States v. Spurlin,*
   664 F.3d 954 (5th Cir. 2011) ................................................. 31

*United States v. Thomas,*
  991 F.2d 206 (5th Cir. 1993) ........................................................... 27, 41

*United States v. Trevino,*
  989 F.3d 402 (5th Cir. 2021) ........................................................... 48, 57

*United States v. Viola,*
  768 F. App'x 238 (5th Cir. 2019) ........................................................ 44

## Constitutional Provisions

La. Const. art. 1, § 10(A) ...................................................................... 37, 44

La. Const., art. 1, §§ 10(A), 10.1.(A)(2), 20 ........................................... 17

La. Const., art. 1, § 10.1(A)(2) (eff. 2018) ........................................... 37, 45

La. Const., art. 1, § 10.1(B) (eff. 2018) ............................................... 37, 45

La. Const., art. 1, § 20 .................................................................... 37, 42, 46

La. Const. art. 4, § 5 ....................................................................... 37, 42

La. Const., art. 4, § 5(E)(1) .............................................................. 17, 43

U.S. Const., amend. II ..................................................................... *passim*

U.S. Const., amend. X ........................................................................ 16, 75

U.S. Const., art. I, § 8 .......................................................................... 74

## Statutes

18 U.S.C. app. § 1202(a)(1) (1982) ......................................................... 29

18 U.S.C. app. § 1202(c)(2) (1982) ......................................................... 29

18 U.S.C. app. § 1203 (1982) ................................................................. 29

18 U.S.C. § 921(a)(20) ................................................................... *passim*

18 U.S.C. § 921(a)(20) (1982) ............................................................... 29

18 U.S.C. § 922(g) ................................................................ 28, 29, 53, 73

18 U.S.C. § 922(g)(1) ..................................................................*passim*

18 U.S.C. § 922(h)(1) (1982) ........................................................... 29

18 U.S.C. § 924(a)(8) .......................................................... 28, 53, 73

18 U.S.C. § 3231 ................................................................................ 1

18 U.S.C. § 3742 ................................................................................ 1

28 U.S.C. § 1291 ............................................................................... 1

Act of April 5, 1790, § 4, in 13 Penn. Stat. 513–14 (1908 ed.) ................................ 67

Act of Aug. 23, 1769 (No. 981), in 4 S.C. Statutes at Large 306-308
    (A.S. Johnston ed. 1838) ............................................................... 67

Act of Dec. 26, 1792, paragraph IV, in 1794 Va. Acts, ch. 109, p. 216
    (Augustine Davis ed. 1794) ............................................................. 67

Act of Mar. 18, 1796, § 62, in N.J. Laws 219-20 (William Patterson ed.
    1800). ................................................................................. 67

An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87–342, §
    2, 75 Stat. 757 (1961) ................................................................ 64

Federal Firearms Act, 52 Stat. 1250, 1250–51 (1938) ......................................... 64

Firearm Owners' Protection Act, Pub. L. 99-308, 100 Stat. 449 (1986) ................... 29

Firearm Owners' Protection Act Section 101 ............................................. 29

1999 La. Acts No. 1251 ..................................................................... 7

2010 La. Acts No. 438 (eff. Aug. 15, 2010) ................................................ 46

2010 La. Acts No. 585, § 1 ................................................................ 72

2021 La. Acts No. 121 (eff. Aug. 1, 2021) ................................................. 46

La. Code Crim. P. art. 401(5) (1967) ..................................................... 46

La. Code Crim. P. art. 401(A)(5) (eff. Aug. 1, 2021) .................................. 37, 45

La. Code Crim. P. art. 871.B ......................................................... 58

La. Code Crim. P. art. 871.B.(1)(a) (2008) ................................. 10

La. Code Crim. P. art. B.(1)(b) (2008) ........................................ 10

La. Rev. Stat. Ann. 40:1379.3.C.(10) ......................................... 35

La. Rev. Stat. Ann. § 14:27.D(3) .................................................. 9

La. Rev. Stat. Ann. § 14:65.3.A ................................................... 9

La. Rev. Stat. Ann. § 14:65.3.B ................................................... 9

La. Rev. Stat. Ann. § 14:95.1 ....................................................... 34

La. Rev. Stat. Ann. § 14:95.1.A (2020) ...................................... 34

La. Rev. Stat. Ann. § 14:95.1.C ................................................... 33

La. Rev. Stat. Ann. § 14:95 .......................................................... 34

La. Rev. Stat. Ann. § 15:571.5.B ................................................. 40

La. Rev. Stat. Ann. § 15:572.B(1) .......................................... 37, 43

La. Rev. Stat. Ann. § 15:574.4.1.C ............................................. 40

La. Rev. Stat. Ann. § 18:102(A)(1)(b) ........................................ 44

La. Rev. Stat. Ann. § 40:1379.1.1.A.(1) ..................................... 34

La. Rev. Stat. Ann. § 40:1379.3.A.(1) ........................................ 34

La. Rev. Stat. § 14:69.A (2007) ................................................... 66

La. Rev. Stat. § 14:69.B.(2) (West eff. 1999–Aug. 15, 2010) ...... 7

La. Rev. Stat. § 14:69.B.(4) (2020) .............................................. 7

La. Rev. Stat. § 15:572(D) ............................................................ 43

La. Rev. Stat. § 18:102(A)(1)(A) ............................................ 37, 44

**Rules**

Fed. R. App. P. 4(b)(1)(A) ........................................................................ 1

Fed. R. Crim. P. 29 .......................................................................... 18, 19

**Other Authorities**

131 Cong. Rec. 16987 (June 24, 1985) ...................................... 36

Brian Sawers, *Original Misunderstandings: The Implications of Misreading History in* Jones, 31 Ga. St. U.L. Rev. 471  (2015) ................................ 70

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009) ...................................................... 61

Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial* Ipse Dixit, 60 Hastings L.J. 1371 (2009) .......................................................................................... 61

Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 2.43D (2024) ............... 48

Francis B. Sayre, *Criminal Attempts*, 41 Harv. L. Rev. 821 (1928) ........................... 68

Jeff Dedge, *History of Handgun Carry Permit Laws* (animation), online at https://upload.wikimedia.org/wikipedia/commons/5/5a/Right_to _Carry%2C_timeline.gif ........................................................ 37

La. Admin. Code tit. 22, § XI-1503 .......................................................... 40

La. Att'y Gen. Op. No. 15-0154, 2015 WL 9581240 (Dec. 17, 2025) .................... 36

R.W. Apple, Jr., *Palace Intruder Is Acquitted by London Jury*, N.Y. Times, Sept. 24, 1982 .................................................................. 70

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139 (2007) ....................................... 62

Wayne R. LaFave, Subst. Crim. L. (3d ed. 2020) ........................................ 68, 69

William Blackstone, *Commentaries on the Law of England* (St. George Tucker ed., 1832)...........................................................................................66, 69

William W. Hening, The New Virginia Justice (T. Nicholson ed. 1795)................. 67

## Jurisdictional Statement

The district court had original jurisdiction over this criminal prosecution pursuant to 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court entered judgment against Mr. Reed on December 17, 2024. ROA.780. Mr. Reed filed a timely notice of appeal the following day. ROA.783; *see* Fed. R. App. P. 4(b)(1)(A).

## Issues Presented for Review

### 1.

(a)    Did the alleged 2007 Louisiana conviction satisfy the definition in 18 U.S.C. § 921(a)(20), despite restoration of civil rights and absence of a state-law firearm ban?

(b)    Does Louisiana's rule about statewide concealed-carry licenses activate the "unless" clause in 18 U.S.C. § 921(a)(20)?

### 2.

Did the district court reversibly err when it refused to instruct the jury about federal and state law rules governing restoration of rights, *mens rea*, and memorializing convictions?

### 3.

Does the application of 18 U.S.C. § 922(g)(1) in these circumstances comport with the Second Amendment?

### 4.

(a)    Does a firearm's previous movement in commerce satisfy the statutory nexus element, and if so,

(b)    Does that nexus element ensure that every prosecution under the statute fits within Congress's affirmative powers?

## Statement of the Case

A jury convicted Appellant Dominic Xavier Reed of unlawfully possessing a firearm in violation of 18 U.S.C. § 922(g)(1).[1] The district court ordered him to serve 41 months of imprisonment followed by 3 years of supervised release.[2] This timely appeal followed. Mr. Reed is expected to complete the imprisonment sentence in January 2026.

The indictment alleged that Mr. Reed violated the federal felon-in-possession law:

> On or about August 28, 2022, knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, to wit, a Smith and Wesson, model M&P 15-22P, 22 caliber pistol, bearing serial number WAF2131, and the firearm traveled in and affected interstate or foreign commerce.[3]

### A. The Possession

On August 28, 2022, around 6:30 p.m., Arlington, Texas, dispatchers received a 911 call complaining about a man who "casually opened his door," stepped out onto his second floor balcony, "shot off like four or five rounds" into an empty parking lot,

---

[1] ROA.40, 717.

[2] ROA.781.

[3] ROA.40.

and then went back inside the apartment.[4] The caller, who could see the apartment building from her backyard, identified the apartments and tentatively reported that the shooter had come from Apartment 50.[5]

When police arrived, they saw Mr. Reed, standing on the landing in front of Apartment 50, about to come down the stairs.[6] After coming down to the ground level to speak with officers,[7] Mr. Reed agreed that shots had been fired,[8] but he denied shooting and denied owning any weapons.[9] Mr. Reed refused a police request for consent to enter Apartment 50, but they went in anyway and found a firearm leaning against the wall near the door.[10]

Officers seized the firearm and arrested Mr. Reed for unlawfully and recklessly discharging a firearm within city limits.[11] They did *not* arrest him for felon-in-possession. Arlington Police Officer Phillip Norton candidly acknowledged that Mr. Reed's

---

[4] Gov't Ex. 3 (audio recording with unofficial transcript).

[5] *Id.*

[6] ROA.1750; *see* ROA.1023-25.

[7] ROA.1063.

[8] ROA.1026-27.

[9] ROA.1063.

[10] ROA.1755; ROA.1063-66.

[11] ROA.1034.

"criminal history" was "unclear" at the time of his arrest. Usually, police can tell whether a previous arrest resulted in a conviction.[12] Mr. Reed had no Texas felony convictions, and "it was not very clear" whether he had any convictions from "outside the State of Texas."[13]

## B. The Firearm

The firearm seized by police and identified in the indictment was a Smith & Wesson model 15-22P. The "P" in the model number is short for "pistol," and the "22" indicates that the model was made to fire an inexpensive rimfire cartridge (.22 long rifle) rather than more powerful ammunition typically associated with so-called "modern sporting rifles."[14] The pistol has features that make it "look like a rifle,"[15] including an "arm brace."[16] Here is a photo excerpted from the 2022 Smith & Wesson Catalog:

---

[12] ROA.1034.

[13] ROA.1034.

[14] ROA.1193-97.

[15] ROA.1188-89.

[16] ROA.1141-42.



(Source: Defense Exhibit 18, ROA.1806).

According to the government's expert on commerce and firearms, the firearm at issue was manufactured in Deep River, Connecticut,[17] then sent to Springfield, Massachusetts, through a company called "SWPC, Incorporated."[18] An invoice from January 2021 indicated that a wholesaler based in Prescott, Arizona, sold the gun to Roy's Pawn Shop in Irving, Texas.[19] According to an ATF form dated February of 2021, Roy's sold the firearm to Freida Reed, also of Irving, Texas.[20]

Months later, in October 2022, Mr. Reed was the victim of an unrelated aggravated assault—shot by a potential romantic rival. He initially refused to cooperate with

---

[17] ROA.1189.

[18] ROA.1202.

[19] ROA.1793.

[20] ROA.1133-39; ROA.1763-64.

investigators.[21] Around that same time, ATF Agent Bryan Cline began contacting Louisiana authorities and asking for records related to two state-court arrests.

## C. The (Alleged) Felony Convictions

The government sought to prove that Mr. Reed had previously been convicted of two different felonies in Louisiana: Possession of Stolen Things, following an arrest in 2007, and Attempted Entry of an Inhabited Dwelling, following an arrest in 2009. All the details are disputed. The government's trial evidence (and non-evidentiary submissions) are summarized below.

### 1. The 2007 Case: Possession of Stolen Things

The government claimed that Mr. Reed was first convicted of "possession of stolen property, 300 to $500,"[22] or "Illegal possession of stolen things, 300 to 499."[23] Between 1999 and 2010, that crime was punishable by up to two years in prison.[24] Today, that same conduct would only be punishable by six months' confinement.[25]

---

[21] ROA.1468.

[22] ROA.1230.

[23] ROA.1235.

[24] La. Rev. Stat. § 14:69.B.(2) (West eff. 1999–Aug. 15, 2010); see also 1999 La. Acts No. 1251.

[25] La. Rev. Stat. § 14:69.B.(4) (2020) ("When the value of the stolen things is less than one thousand dollars, the offender shall be imprisoned for not more than six months or may be fined not more than one thousand dollars, or both.").

The government presented three exhibits (21, 22, and 37) in support of this allegation. Government Exhibit 22 was described as records of the arresting agency. One form named "Freida Reed"[26] as the defendant's mother; another included a "poor quality" photograph that, according to a government witness, depicted Mr. Reed.[27] Exhibit 37 included fingerprints and other identifying information that "came from the Federal Bureau of Investigation packet that was provided to" one of the government's witnesses.[28]

Exhibit 21 included a "minutes report" from the court clerk as well as a "bill of information." The minute entries begin in May 2008, when the defendant was apparently on probation, but do not describe how the defendant came to be on probation.[29]

These exhibits disagreed about many details of this disposition. For example, the date of the 2007 offense was July 14, 2007,[30] but also August 13, 2007.[31] The defendant in that case was arrested on August 13, 2007,[32] but the "booking date" was

---

[26] ROA.1970.

[27] ROA.1416.

[28] ROA.1353.

[29] ROA.1769–72.

[30] ROA.1773.

[31] ROA.802.

[32] ROA.1970, 1773.

August 25, 2007.[33] The trial evidence is silent about how guilt was established—by guilty plea, no contest plea, bench trial, or jury trial—or whether it was established at all.

### 2. The 2009 Case: Attempted Unauthorized Entry into an Inhabited Dwelling

The government also alleged that Mr. Reed had been convicted of attempted unauthorized entry of an inhabited dwelling.[34] The government did not present any evidence from an arresting or investigating agency for this allegation. It relied solely on a minutes report (Exhibit 23, pages 2–3),[35] a bill of information (Exhibit 23, page 1),[36] and a fingerprint document.[37]

---

[33] ROA.1971.

[34] The substantive crime of unauthorized entry is defined as

> the intentional entry by a person without authorization into any inhabited dwelling or other structure belonging to another and used in whole or in part as a home or place of abode by a person.

La. Rev. Stat. Ann. § 14:65.3.A. The substantive crime is punishable by up to six years' imprisonment. La. Rev. Stat. Ann. § 14:65.3.B. The maximum punishment for attempt is "one-half the longest term of imprisonment prescribed for the offense so attempted." La. Rev. Stat. Ann. § 14:27.D(3).

[35] ROA.1782-83.

[36] ROA.1781.

[37] ROA.803-04.

According to the government's exhibits, this offense was committed on October 18, 2009,[38] but also on November 7, 2009.[39] The defendant was arrested on November 7, 2009,[40] or maybe November 16, 2009.[41]

The "Minutes Report" for a case described as "10/18/2009 Att/Unauth Entry Inhabit Dwell" has only one entry, apparently dated October 12, 2011.[42] This entry describes a guilty plea followed by a sentence of three years at hard labor, with credit for time served.[43] According to the minute entry, "The accused was fingerprinted."[44] The government did not present copies of the fingerprints taken that day.

This was unusual. Under Louisiana law, the sheriff must memorialize a judgment of guilty by taking the defendant's fingerprints, attaching them to the back of the charging document.[45]

---

[38] ROA.1781.

[39] ROA.804.

[40] ROA.804.

[41] ROA.1781.

[42] ROA.1782.

[43] ROA.1782.

[44] ROA.1782.

[45] La. Code Crim. P. art. 871.B.(1)(a), B.(1)(b)(i)–(ii) (2008).

At trial, the lead investigator removed the certified copies of the charging documents and physically examined them. Neither one had fingerprints attached to the back.[46] The investigator acknowledged that he had examined Louisiana conviction records in the past, and those included the defendant's fingerprints on the back.[47]

Outside the presence of the jury, the district court expressed dismay about the absence of anything like "a certified judgment of conviction":

> I've been very perturbed about the quality of the evidence being offered as to the existence of convictions in Louisiana, because normally we would expect there to be a certified judgment of conviction from somewhere. ... I've been doing this a long time and never had this question come up."[48]

The government contended it could prove the convictions through a "patchwork" of other evidence. That "patchwork" included no witnesses from any Louisiana agency or court; no witnesses with personal knowledge about the allegations or the dispositions; and no one from the FBI. Even so, the district court ultimately decided that the government's exhibits "tend to show that there is a conviction," and left it up to the jury to decide whether to believe them.[49]

---

[46] ROA.1449, 1452.

[47] ROA.1461.

[48] ROA.1298.

[49] ROA.1298.

The government presented no evidence at trial tending to show when the defendant(s) in the 2007 and 2009 cases were confined (if at all) or when the defendant(s) completed their sentences. In Mr. Reed's view, the government was required to prove that the prior disposition met the statutory definition of "conviction," which (as explained below) should require a determination about when the sentence ended.

There are *some* documents in the appellate record that include assertions about when the sentence(s) would have ended. For example, the PSR asserted that the sentence in the 2007 Case was "discharged" on March 7, 2011.[50] Before trial, the government claimed that Mr. Reed was *paroled* on March 7, 2011, but that he "had not yet completed his sentence."[51] None of those assertions was ever put to adversarial testing below—and no assertion was made through authenticated or competent trial evidence.

### D. The Detention Hearing and Its Aftermath

As noted above, Mr. Reed had originally been charged in state court with crimes related to shooting a gun within city limits. He was released on bond on August 30, 2022,[52] and he remained in the community for more than five months.[53] So Mr. Reed

---

[50] ROA.1827.

[51] ROA.479.

[52] ROA.1824.

[53] *See* ROA.3 (noting a federal arrest date of April 4, 2023).

was a little shocked when the U.S. magistrate judge ordered him detained pending trial on April 6, 2023.[54] Among other factors, that order cited Mr. Reed's decision *as a victim* to withhold cooperation with the unrelated investigation into him being shot.[55]

At the time, Mr. Reed was detained at the Johnson County Detention Center, where all his phone calls were recorded.[56] In the days following the detention hearing, Mr. Reed made several calls where he expressed frustration and resignation at his inability to contest the government's detention-hearing allegations. In some of those calls, Mr. Reed expressed a desire to just plead guilty to the federal charge at the next opportunity and get it over with.[57]

On a subsequent call, apparently continuing the same conversation, Mr. Reed explained his state of mind after the hearing but also on August 28, 2022:

---

[54] ROA.31.

[55] ROA.31.

[56] ROA.1206-07.

[57] *See*, e.g., Gov't Ex. 24a, 24b, 24c; 24d.

> **Male Voice**: Yeah. That kind of went like... I learned a lot, at that last court that I went to, I learned a lot in general just about... Especially in the federal case, but I already knew that. But my position is probably not in the best interest of the defendant to ever try to argue in a court setting. If you have anything positive going on in your life, just mention that and leave it alone. Because they just said all kind of inaccurate information and it made me look bad.

(Source: On-screen transcript of Defendant Exhibit 14 (26x))

> **Male Voice**: Before I lose my train of thought, I thought that the past was old. So I'm not thinking I'm a convicted felon around a firearm. It's over 10 years ago. But they don't go 10 years. They go 15 now. The law is always changing. See, I'm thinking that 10 years, I don't have anything to worry about. I don't have to report it on job applications. it's from 2007. So I'm thinking, this is 2023.

(Source: On-screen transcript of Defendant Exhibit 13 (26y))

### E.  The Pretrial and Mid-Trial Motions

After recovering from that initial shock, Mr. Reed decided to put the government to its burden of proof at trial.[58] The parties engaged in extensive pretrial litigation. Pertinent motions are summarized below.

---

[58] ROA.897-98.

14

1. **Mr. Reed moved to dismiss the indictment and renewed the motion multiple times.**

Before trial, Mr. Reed asked the district court to dismiss the indictment, raising constitutional challenges to the possession prong of 18 U.S.C. § 922(g)(1), "as commonly understood and applied."[59] The first argument—related to Congress's commerce power, and the proper interpretation of the possession prong's nexus-with-commerce element—was raised solely for purposes of preservation.[60]

The second argument invoked the Second Amendment.[61] On that issue, the government responded with numerous arguments this Court would later reject.[62] In its initial decision denying dismissal, the district court adopted those same arguments.[63]

At trial, after the government rested,[64] Mr. Reed raised a renewed or supplemental motion to dismiss, specifically raising both facial and as-applied challenges to

---

[59] ROA.45.

[60] ROA.45-49.

[61] ROA.49-52; *see also* U.S. Const., amend. II.

[62] ROA.54-66.

[63] ROA.82.

[64] ROA.1464.

§ 922(g)(1) under the interstate commerce clause, the Second Amendment, federalism, and the Tenth Amendment.[65] He noted that the allegations about two "nonviolent offenses" would not trigger "a prohibition on possession on firearms in the home at the time," and because the firearm is a type "ordinarily used by civilians for lawful purposes."[66] Mr. Reed also argued that his possession of a firearm on August 8, 2022, "would have been lawful" under Texas law, where the conduct occurred, or in Louisiana, where the alleged convictions arose.[67] The court denied the renewed or supplemental motion.[68]

After the jury convicted, but before sentencing, this Court decided *United States v. Diaz*, 116 F.4th 468 (5th Cir. 2024). Mr. Reed filed a motion to reconsider the earlier denials.[69] The district court agreed to reconsider its earlier decision, but denied the request to dismiss.[70]

---

[65] ROA.1465-66.

[66] ROA.1465.

[67] ROA.1466.

[68] ROA.1466.

[69] ROA.732-47.

[70] ROA.763.

**2. Mr. Reed asked the court to exclude the 2007 Case because the disposition could not satisfy the definition of "conviction" found in 18 U.S.C. § 921(a)(20).**

Mr. Reed moved to exclude any mention or evidence about the 2007 case because, even if all the government's allegations about that case were true, the conviction would not satisfy the definition of "conviction" found in 18 U.S.C. § 921(a)(20).[71] That statute defines "conviction" for purposes of § 922(g)(1), and it excludes any conviction "for which a person has been pardoned or has had civil rights restored … unless such pardon … or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms."[72]

Louisiana law is important to this argument. First, the state has several constitutional provisions that *automatically* restore a felon's civil rights, either immediately or after the passage of time.[73] Second, the state *allows* felons to possess firearms, either at the time of release or, for some felonies, after ten years.

The district court rejected Mr. Reed's argument because, even after restoration of civil rights, a person convicted of Possessing Stolen Things would be ineligible for a statewide concealed handgun license:

---

[71] ROA.427-33.

[72] 18 U.S.C. § 921(a)(20).

[73] *See* La. Const., art. 1, §§ 10(A), 10.1.(A)(2), 20; art. 4, § 5(E)(1) (all quoted and discussed below).

> [T]he Court concludes that even assuming that Defendant's rights were restored under Louisiana law after his 2007 conviction, that state's concealed handgun law triggers the "unless" exception to 18 U.S.C. § 921(a)(20) and "precludes the [defendant] from taking advantage of the statutory exception [for restoration of rights as provided in that section]."[74]

Under this view, a Louisiana felony conviction would always meet the definition in 18 U.S.C. § 921(a)(20), even after rights were restored and after any ten-year waiting period expired. As explained below, Mr. Reed contends that the district court misinterpreted § 921(a)(20).

**3. After the government rested, Mr. Reed moved for a judgment of acquittal as to all elements of 18 U.S.C. § 922(g)(1).**

Mr. Reed moved, unsuccessfully, for a judgment of acquittal under Federal Rule of Criminal Procedure 29 on "all elements."[75] In addition to that general motion, he raised some specific arguments that are relevant to this appeal:

- that there was no evidence that the possession of this firearm was in or affecting commerce;[76]

- that there was no evidence about the "original proceedings" that led to probation in the 2007 case;[77]

---

[74] ROA.624 (quoting *United States v. Kyllonen*, 774 F. App'x 212, 213 (5th Cir. 2019)).

[75] ROA.1471-82.

[76] ROA.1471.

[77] ROA.1472.

- that, as a matter of law, Louisiana would have "nullified, for all legal purposes, any force and effect or any prohibiting nature" of the 2007 conviction;[78]

- that a clerk's minute entry is insufficient to prove the existence of a qualifying judgment of conviction;[79]

- that there was no order, judgment, or sentence signed by a judge that would allow the Louisiana corrections authorities to imprison a defendant;[80] and

- that the government failed to present a bill of information or indictment with fingerprints attached, which would be required to commemorate a judgment of conviction under Louisiana law.[81]

The district court acknowledged that Mr. Reed made "good points," but decided that the government had presented enough evidence to get to the jury.[82] Despite this legal determination that the government's evidence was (at least) minimally sufficient to survive the Rule 29 motion, the government repeated its earlier misgivings:

> THE COURT: Well, you would agree with me, though, that it is not as strong of evidence as you would have had if you had a judgment of conviction signed by the judge.

---

[78] ROA.1472.

[79] ROA.1473.

[80] ROA.1473.

[81] ROA.1474-75.

[82] ROA.1482.

[THE PROSECUTOR]: I don't know that I would agree with that, Your Honor, especially if you look at exhibits ~

THE COURT: It's hard for me to take you seriously when you say that. ...

THE COURT: You're going to tell me that you would rather ~ that is just fine with you, and if you had the actual judgment and commitment order that you would have said, oh, well, I won't worry about that because this is just as good?[83]

### F. Jury Instructions, Note from the Jury, and Verdict

After the parties rested, the court presided over a lengthy off-the-record conference about the jury instructions.[84] The court reconvened the next morning for formal objections to the charge. Mr. Reed had filed a lengthy requested jury charge on January 19, 2024,[85] and a supplemental request on March 21, 2024.[86] The court formally denied those requests, except to the extent that they were already incorporated into the charge.[87]

Mr. Reed also reiterated arguments raised the previous afternoon during the charge conference. He urged the court to tell the jury about federal and Louisiana law

---

[83] ROA.1488.

[84] ROA.1524.

[85] ROA.445-67.

[86] ROA.656-57.

[87] ROA.1526.

concerning restoration of civil rights.[88] He asked for an instruction better explaining the knowledge-of-status element and proposed various alternatives.[89] He also asked the court to define the nexus-with-commerce element in a way that would require more than previous passage across state lines.[90]

The court then denied Mr. Reed's oral objections and requests.[91] The final jury charge was transcribed by the court reporter (ROA.1531-46) and is reprinted in the second pleadings volume (ROA.696-714).

During deliberations, the jury sent a note to the Court asking for clarification about the nexus-with-commerce element:

> Could we have clarification on the 4th element on [page] 15? Are we to decide if the firearm has <u>ever</u> traveled in or affected interstate or foreign commerce for any reason? Or only traveled in or affected interstate or foreign commerce due to actions taken by the defendant?[92]

The court responded consistently with its earlier rulings:

> You are to decide whether the firearm has ever traveled in or affected interstate or foreign commerce for any reason, but that must

---

[88] ROA.1527-28.

[89] ROA.1527.

[90] ROA.1527-28.

[91] ROA.1526-28.

[92] ROA.716; *see also* ROA.1580-81.

have occurred prior to August 28, 2022, the date the defendant is
alleged to have possessed the firearm.[93]

The jury ultimately returned a guilty verdict.[94]

### G. Sentencing

Based on a total offense level of 20 and a criminal history category of III, the

district court calculated an advisory guideline range of 41–51 months.[95] Most of the

pre-sentence litigation concerned sentencing matters which are not raised in this ap-

peal or preservation of issues disputed at trial.

Even so, a few points are worth further consideration. Sentencing is not the

same as a trial. The Probation Office, the government, and the court are not bound

by the Federal Rules of Evidence, and the defendant does not have access to the same

procedural protections that would apply at sentencing. In other words, there is not

necessarily a one-to-one correspondence between a court's findings at sentencing and

the findings a jury or the court would have made, beyond a reasonable doubt, at trial.

The Presentence Investigation Report is the first time in the record anyone men-

tioned a Louisiana arrest, on July 19, 2012, for possession of a firearm by a felon.[96]

---

[93] ROA.716.

[94] ROA.717.

[95] ROA.1863.

[96] ROA.1829.

According to the PSR, the defendant was acquitted by an Orleans Parish jury on March 12, 2013.[97] We know that the state charge would not rely on Possession of Stolen Things, because that conviction would not trigger Louisiana's felon-in-possession law. So, if the PSR is correct, that means Mr. Reed was previously accused of possessing a firearm after some other felony conviction, and a jury acquitted him.

The PSR also addressed the sentences allegedly imposed in the 2007 and 2009 cases. For the 2007 Case, the Probation Officer determined that the two-year sentence "discharged" on March 7, 2011.[98] The government did not object to that finding.[99] In response to Mr. Reed's objection that the entire discussion of that disposition was based on unreliable information, the probation officer explained that the information was drawn from "Louisiana Department of Corrections records."[100] The March 7, 2011 date appears two times in the DOC database printouts: in fields marked "DOC Exp. Date" and "Closure Date."[101]

---

[97] ROA.1829.

[98] ROA.1827.

[99] ROA.1836.

[100] ROA.1860.

[101] ROA.504.

The 2009 Case was problematic, in part because the PSR suggested that Mr. Reed was simultaneously incarcerated for the 2009 case *and* being charged with felon-in-possession in another parish. (The PSR said he was acquitted of that charge in 2013). The PSR Addendum was less confident in the timeline:

> While the date of parole or discharge of sentence may be unclear based upon the records received, no matter the parole date, the defendant would still receive the same [criminal history] points at USSG § 4A1.1(a) because it is within the applicable timeframe. Therefore, no changes are made, unless the Court rules otherwise.[102]

The district court acknowledged the "apparent discrepancy" between the PSR's assertions of an alleged "parole" date and the Orleans Parish prosecution/acquittal. The court did not resolve the dispute because the date of release or discharge would be immaterial under the guidelines.[103]

The court chose to sentence Mr. Reed at the bottom of the applicable guideline range: 41 months of imprisonment, followed by 3 years of supervised release.[104] The

---

[102] ROA.1861.

[103] ROA.1945 (tentative findings); ROA.1603-04 (adoption of tentative findings).

[104] ROA.1604-12.

court pronounced sentence and entered written judgment on December 17, 2024.[105]
Mr. Reed filed a timely notice of appeal the following day.[106]

Given the lengthy pretrial detention, Mr. Reed has nearly finished the imprisonment portion of his sentence. According to the Bureau of Prisons' Inmate Locator, his anticipated release date is January 12, 2026.

## Summary of the Argument

1.    The district court misinterpreted 18 U.S.C. § 921(a)(20). After Louisiana restores a felon's civil rights, and after the expiration of any statutory waiting period, the federal firearm disability associated with the conviction terminates. The state's concealed handgun licensing scheme is irrelevant.

2.    The district court should have informed the jury of federal and state laws related to restoration of rights. The facts were disputed, and the jury's historical role includes resolution of facts and mixed questions. The jury should have considered the relevant laws when deciding whether the government had proven prohibited status. But the jury also needed to know the governing rules so it could properly evaluate *knowledge* of prohibited status.

---

[105] ROA.1599.

[106] ROA.783.

3.    This conviction is inconsistent with the Second Amendment. The nation's historical tradition of firearm ownership does not include analogous lifelong firearm bans or severe punishment for people who committed comparable crimes.

4.    Mr. Reed preserves foreclosed constitutional and statutory arguments related to Congress's affirmative powers to enact a law like this.

Argument

**I. As a matter of law, the 2007 Stolen Things disposition cannot "be considered a conviction for purposes of" 18 U.S.C. § 921(a)(20) and § 922(g)(1).**

The district court should have excluded any mention of the 2007 Case because the alleged conviction entered in that case would not satisfy the specialized definition of "conviction" found in 18 U.S.C. § 921(a)(20). The district court denied the motion because it adopted an alternative (and incorrect) interpretation of that statutory definition. This Court should correct the error and vacate the judgment of conviction.

The issue can be stated succinctly: as a general rule, a federal law prohibits the possession of firearms after a felony conviction. But the law makes an exception for a defendant who has been pardoned for the conviction, or who had his civil rights fully restored. After that, the defendant is free to possess firearms without violating federal law, *unless* the pardon or restoration bans him from possessing guns.

The question here is what to do with a pardon or restoration of rights that *allows* possession of firearms, but *denies* eligibility for a concealed carry permit? As explained below, that's exactly how Louisiana law works. According to the district court, the concealed handgun licensing law is no different from a law banning the possession of firearms. Mr. Reed disagrees. That holding is inconsistent with the plain meaning of the statute, binding precedent, and Congressional purpose. This Court should reverse the district court.

## A. Review is *de novo*.

This Court reviews questions of law, including questions of statutory interpretation, *de novo*.[107] When the *meaning* of § 921(a)(20) is at issue, this Court has consistently analyzed the undisputed facts under *de novo* review.[108]

The "legal definition" found in § 921(a)(20) "has implications for admissibility."[109] "A prior conviction will only be admissible if it satisfies the legal definition under § 921(a) because any conviction that did not satisfy the relevant definition of a

---

[107] *United States v. Hall*, 134 F.4th 782, 787 (5th Cir. 2025) (citing *United States v. Garcia-Gonzalez*, 714 F.3d 306, 312 (5th Cir. 2013)).

[108] *See United States v. Broadnax*, 601 F.3d 336, 345–46 (5th Cir. 2010); accord *United States v. Osborne*, 262 F.3d 486, 488–89 (5th Cir. 2001); *see also United States v. Daugherty*, 264 F.3d 513, 514 (5th Cir. 2001) (quoting *United States v. Thomas*, 991 F.2d 206, 209 (5th Cir. 1993)) ("The question whether a felony conviction may serve as a predicate offense for a prosecution for being a felon in possession of a firearm pursuant to § 922(g)(1) is 'purely a legal one.'").

[109] *Broadnax*, 601 F.3d at 346 n.7.

predicate criminal offense would be irrelevant to determining a violation under § 922(g), and therefore, inadmissible."[110]

Even under the abuse-of-discretion standard, the outcome would be the same. A district court always "abuses its discretion when it 'applies an erroneous view of the law.'"[111]

Mr. Reed preserved the issue for plenary appellate review. He moved to exclude any mention of the 2007 Stolen Things disposition.[112] He continued to challenge the district court's erroneous interpretation of § 921(a)(20) by, e.g., arguing that the government should have to prove when the relevant sentence ended "because of Louisiana's restoration of rights provision."[113]

## B. The parties proposed divergent interpretations of § 921(a)(20)'s "unless clause." The district court joined the wrong side of the debate.

Title 18, Section 922(g)(1) identifies nine categories of prohibited persons who are banned from four types of conduct involving firearms: shipping, transportation,

---

[110] *Id.*

[111] *Hall*, 134 F.4th at 787 (quoting *United States v. Hamilton*, 46 F.4th 389, 394 (5th Cir. 2022) (cleaned up).

[112] ROA.427-33.

[113] ROA.1528.

possession, and receipt.[114] The first category is anyone "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year."[115] We typically use the word *felon* to describe someone in this category, and we describe the predicate crime as a *felony*. Those terms are a convenient shorthand, but they are imprecise at the margins.

In 1986, Congress adopted a specialized definition for the statutory term "convicted of."[116] The definition identified four post-conviction events that would terminate the federal firearm disability:

> Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.[117]

---

[114] As discussed below, this case involves the possession ban: "It shall be unlawful" for a prohibited person to "possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1).

[115] 18 U.S.C. § 922(g)(1).

[116] *See* Section 101 of the Firearm Owners' Protection Act, Pub. L. 99-308, § 101(5), 100 Stat. 449, 450 (1986). Between 1968 and 1986, there were two (partially overlapping) federal bans related to felons and firearms. *Compare* 18 U.S.C. §§ 921(a)(20), 922(g)(1), 922(h)(1) (1982) *with* 18 U.S.C. app. §§ 1202(a)(1), 1202(c)(2), 1203 (1982). FOPA consolidated those bans into 18 U.S.C. § 922(g), and then crafted a single definition to govern. *See* Pub. L. 99-308, § 101, 102, 100 Stat 450, 452.

[117] 18 U.S.C. § 921(a)(20).

In *Caron v. United States*,[118] the Supreme Court interpreted this statute and made two important points clear. First, an *automatic* restoration of rights "by operation of law," is just as effective as an individualized act of clemency: "Nothing in the text of § 921(a)(20) requires a case-by-case decision to restore civil rights to this particular offender."[119] Second, the Court rejected a firearm-by-firearm approach to the carve-out:

> Either the restorations forbade possession of "firearms" and the convictions count for all purposes, or they did not and the convictions count not at all. The unless clause looks to the terms of the past restorations alone and does not refer to the weapons at issue in the present case.[120]

Under the Supreme Court's plain-meaning approach in *Caron*, this should be a straightforward and binary inquiry: "Either the restorations forbade possession of 'firearms' and the convictions count for all purposes, or they did not and the convictions count not at all."[121]

The district court took a different approach. Even without a ban on possessing, transporting, shipping, or receiving firearms, the court decided that Louisiana's law making a felon ineligible for a statewide concealed carry license activated the unless

---

[118] 524 U.S. 308 (1998).

[119] *Caron*, 524 U.S. at 313.

[120] *Caron*, 524 U.S. at 314.

[121] 524 U.S. at 308.

clause. In other words, after a felon's rights are fully restored, and even after he regains the right to possess and carry firearms, his inability to get a statewide concealed handgun license puts him in the same position as someone who is banned from possessing guns.[122]

### 1. The district court's interpretation is inconsistent with the plain meaning of the statutory text.

"The first step in statutory interpretation—and the only step needed here—is to look at the plain meaning of the statutory language."[123] According to the plain language of § 921(a)(20), a post-conviction pardon or restoration of civil rights lifts the federal firearm disability, "unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." The statute does not say "unless such pardon or restoration of civil rights *restricts* the felon's use of firearms." Only a ban will invoke the clause. In the Supreme Court's words, we must look to state law to identify "the class of criminals who 'may not ... possess ... firearms.'"[124]

In *Caron*, the Court utilized the plain-meaning approach to decide whether Massachusetts's felons-and-firearms statute, which allowed a felon to possess rifles and

---

[122] ROA.624.

[123] *United States v. Spurlin*, 664 F.3d 954, 964 (5th Cir. 2011).

[124] *Caron*, 524 U.S. at 310.

shotguns, but forbade possession of "handguns outside his home or business," would activate the unless clause.[125] The Court explained that the proper mode of analysis is "all-or-nothing":

> Either the restorations forbade possession of "firearms" and the convictions count for all purposes, or they did not and the convictions count not at all.[126]

Under that rubric, this is an easy case. Louisiana does not "expressly provide" that a felon cannot possess firearms. On the contrary, the state affirmatively allows felons to regain the right to possess and carry any lawful firearm.

Louisiana's rules for felons and firearms are also far "less restrictive" than the laws in other jurisdictions.[127] For many felonies, state law places no restriction on the possession of firearms after completion of the sentence: "A convicted felon who completed his sentence and supervision is not prohibited from possessing firearms."[128] For a few more serious felonies, Louisiana bans the possession of firearms "for a period of

---

[125] *Id.* at 313.

[126] *Id.* at 314.

[127] *State v. Eberhardt*, 145 So. 3d 377, 385 n.6 (La. 2014).

[128] *State v. Williams*, 366 So. 2d 1369, 1375 (La. 1978), *abrogated on other grounds by State v. Landry*, 588 So. 2d 345, 347 (La. 1991).

only ten years from the date of completion of sentence, probation, parole, or suspension of sentence."[129] This ten-year period is sometimes called a waiting period or "cleansing period."[130] At the expiration of the waiting period, those felons regain their right to possess firearms.

Because Louisiana *allows* felons to possess and carry any lawful firearm anywhere in the state (either immediately or after a waiting period), the unless clause is not activated. A pardon or restoration of rights also lifts the federal firearm disability.

### 2. The district court's interpretation is inconsistent with binding precedent.

As this Court has repeatedly recognized, after restoration of rights (and after any applicable waiting period expires), a conviction ceases to count for purposes of § 921(a)(20) and 922(g)(1).[131] In *United States v. Dupaquier*, the Court applied that logic to Louisiana law and reversed the defendant's conviction under § 922(g)(1).[132] And in *United States v. Osborne*,[133] the Court reaffirmed *Dupaquier* and reversed a § 922(g)(1)

---

[129] *Eberhardt*, 145 So. 3d at 385 (discussing La. Rev. Stat. Ann. § 14:95.1.C).

[130] *Eberhardt*, 145 So. 3d at 385 n.6.

[131] *Osborne*, 262 F.3d at 490.

[132] *Dupaquier*, 74 F.3d at 619.

[133] 262 F.3d 486 (5th Cir. 2001).

conviction because Illinois restored a felon's civil rights and firearm rights: "Decisions by the Supreme Court have not eroded *Dupaquier*'s controlling force."[134]

*Osborne* provides that the government is limited to the version of the statute in place *when* rights were restored.[135] The statute in question—La. Rev. Stat. Ann. § 14:95.1—has been amended at least eight times between 2009 and 2022. *None* of those versions imposes a waiting period or bans firearm possession by someone convicted of possessing stolen things.[136]

The government argued below that Louisiana's concealed handgun laws changed the analysis, but that is wrong. Louisiana generally prohibits the concealed carry of firearms by any person.[137] There are, however, various mechanisms by which someone can secure permission to carry a concealed handgun. For example, a sheriff can issue a parish-wide concealed handgun permit to "any person."[138] The Department of Public Safety can issue a statewide concealed carry permit.[139] Felons are not eligible

---

[134] *Osborne*, 262 F.3d at 490.

[135] *Osborne*, 262 F.3d at 492.

[136] *Compare* La. Rev. Stat. Ann. § 14:95.1.A (2004) *with* La. Rev. Stat. Ann. § 14:95.1.A (2020).

[137] La. Rev. Stat. Ann. § 14.95.

[138] La. Rev. Stat. Ann. § 40:1379.1.1.A.(1).

[139] La. Rev. Stat. Ann. § 40:1379.3.A.(1).

for a statewide concealed carry permit if the felony conviction has not been expunged.[140]

But none of that has anything to do with § 921(a)(20). For one thing, Louisiana does not require a license to purchase or own a gun.[141] For another, Louisiana is an "open carry" state—and has been for more than 150 years.[142] Under state law, every "citizen is guaranteed the right to keep and bear arms not concealed on his person."[143] Moreover, in Louisiana, citizens are free to *transport* weapons anywhere in the state without a permit.

That means the rules about concealed handgun licenses cannot be analyzed like a ban on *transportation* of firearms. After a waiting period, a Louisiana felon can possess, ship, transport, or receive any lawful firearm.

It is true that the statewide concealed carry license was unavailable when this Court decided *Dupaquier*. The system came into being later in 1996. But that means

---

[140] La. Rev. Stat. Ann. 40:1379.3.C.(10).

[141] *Cf. Caron*, 524 U.S. at 311 ("Massachusetts law allowed petitioner to possess rifles or shotguns, as he had the necessary firearm permit and his felony convictions were more than five years old.").

[142] *See State v. Chandler*, 5 La. Ann. 489, 490 (1850).

[143] *State v. Nelson*, 367 So. 2d 317, 318 (La. 1979); accord *State v. Ferrand*, 664 So. 2d 396, 397 (La. 1995) ("As the officer acknowledged, the public possession of an openly displayed handgun is not a crime in Louisiana and does not alone provide probable cause for an arrest.").

felons are in the same position today as they were back then—they can carry any lawful firearm, but they can only carry concealed with a parish-specific sheriff's permit.

In 2015, Louisiana's Attorney General confirmed this understanding when he issued a formal opinion recognizing that the federal firearm prohibition would terminate at the end of the ten-year cleansing period.[144]

### 3. The district court's interpretation is inconsistent with Congressional purpose.

Senator Orrin Hatch was one of the principal architects of the 1986 amendment to § 921(a)(20), and he explained Congress's reasons for adopting this definition. Congress was unhappy with court decisions continuing to enforce the federal firearm ban against felons "who have had their criminal records expunged, who have been pardoned, or who have had their full civil rights restored pursuant to State law."[145] Because the federal ban was triggered by state-court convictions, Congress thought state of prosecution should have "authority" to "determine eligibility for firearm possession after a felony conviction or plea of guilty to a felony."[146]

The district court's interpretation is also anachronistic. In 1986, no one in Congress would have equated the right to possess or transport firearms with the right to

---

[144] La. Att'y Gen. Op. No. 15-0154, 2015 WL 9581240 (Dec. 17, 2025).

[145] 131 Cong. Rec. 16987 (June 24, 1985).

[146] *Id.*

*concealed* carry. At that time the vast majority of states had either "no issue" or "may issue" permitting regimes.[147] The Supreme Court had long ago recognized that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons."[148]

## C. If Mr. Reed was truly convicted of possessing stolen things and sentenced to two years' incarceration, then his civil rights were restored long before August 8, 2022.

Louisiana is laudably magnanimous when it comes to former felons. The state constitution "fully restore[s]" the rights of citizenship upon completion of a sentence for "any offense."[149] First-time felony offenders are automatically pardoned.[150] Even repeat felons regain the specific rights to vote,[151] hold public office,[152] and serve on a jury,[153] either immediately or (at most) five years after completing their sentence.

---

[147] *See*, e.g., Jeff Dedge, *History of Handgun Carry Permit Laws* (animation), online at https://upload.wikimedia.org/wikipedia/commons/5/5a/Right_to_Carry%2C_timeline.gif

[148] *Robertson v. Baldwin*, 165 U.S. 275, 281–82 (1897).

[149] *United States v. Dupaquier*, 74 F.3d 615, 618 (5th Cir. 1996) (discussing La. Const. art. 1, § 20).

[150] La. Const. art. 4, § 5; La. Rev. Stat. Ann. § 15:572.B(1).

[151] La. Const. art. 1, § 10(A); *see also* La. Rev. Stat. § 18:102(A)(1)(A).

[152] La. Const., art. 1, § 10.1(A)(2), (B) (eff. 2018). But that right is automatically restored five years after completion of the sentence. § 10.1(B).

[153] La. Code Crim. P. art. 401(A)(5) (eff. Aug. 1, 2021).

To convict Mr. Reed under 18 U.S.C. § 922(g)(1), the government was required to prove the existence of a *qualifying* predicate conviction. The prior-conviction element incorporates a wordy and technical definition,[154] but this argument focuses on a single sentence:

> Any conviction ... *for which a person has been pardoned or has had civil rights restored* shall not be considered a conviction for purposes of this chapter, unless such pardon ... or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.[155]

---

[154] Title 18, Section 921(a)(20) provides:

(a)  As used in this chapter ...

(20) The term "crime punishable by imprisonment for a term exceeding one year" does not include‐

(A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or

(B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

18 U.S.C. § 921(a)(20).

[155] *Id.* (emphases added).

There are multiple mechanisms by which Mr. Reed's rights would have been restored. Once that happened, any federal disability resulting from the 2007 case would be terminated: a person convicted of Possession of Stolen Things can possess firearms as soon as their sentence ends, without any statutory waiting period.

Mr. Reed invoked his constitutional right to a jury trial and he refused to admit the government's accusation that he was under prohibited status in August of 2022. At all times, the burden of proof rested solely on the government's shoulders. Nothing in this brief should be taken as a concession about the adequacy of the government's proof either of the existence of the prior disposition(s), the nature of those dispositions, or the disabling effect of those dispositions.

Assuming, for purposes of argument, that the government proved a conviction for possessing stolen things followed by a two-year prison sentence imposed on November 22, 2010, the defendant's civil rights would have been restored as soon as he completed that sentence. Alternatively, state law would automatically restore his civil rights five years later.

### 1. Mr. Reed would have completed a two-year sentence long before August 2022.

Even at this late date, it is unclear when (according to the government) Mr. Reed *satisfied* the two-year sentence allegedly imposed on November 22, 2010. Under Louisiana law, multiple documents should provide that information, including the

"certificate of parole"[156] (setting out the conditions and duration of supervision) and the "certificate of discharge"[157] (reflecting completion of the sentence and providing notice of the same to the defendant). If those certificates exist, they were not presented below.

The trial evidence is silent about when the sentence would have been satisfied. Looking outside the trial record, several dates were suggested. The Presentence Investigation Report asserted that Mr. Reed "discharged" the 2007 sentence on March 7, 2011,[158] and the government did not object.[159] Before trial, the government conceded that Mr. Reed's "incarceration on the Possession case ended March 7, 2011," but asserted that he remained under supervision—"he was paroled in March 2011."[160]

The government also filed an unauthenticated letter from Louisiana's Department of Correction, dated October 2022, asserting that (a) the relevant file "has been destroyed according to statute," and (b) "Mr. Reed was released from supervision on

---

[156] La. Rev. Stat. Ann. § 15:571.5.B; La. Rev. Stat. Ann. § 15:574.4.1.C.

[157] La. Admin. Code tit. 22, § XI-1503.

[158] ROA.1827.

[159] ROA.1836.

[160] ROA.479, 481.

November 5, 2012."[161] The filing also included some hard-to-decipher database material which was not presented at trial.[162] Nothing in that material suggested that Mr. Reed was *paroled* in March 2011.[163]

If Mr. Reed completed a two-year sentence on *any* of these dates—November 2010, March 2011, or November 2012—his civil rights would have been restored immediately, or (at the latest) five years after that date.

**2. The Louisiana Constitution guarantees a generalized restoration of rights when an offender completes his sentence.**

In *Caron*, the Supreme Court recognized that an automatic restoration of rights works the same as an individualized act of executive clemency: "Nothing in the text of § 921(a)(20) requires a case-by-case decision to restore civil rights to this particular offender."[164]

---

[161] ROA.500.

[162] ROA.501-04.

[163] One of the pages included an entry suggesting that March 7, 2011, was the "fullterm-releas[e]" date for case 907429. *See* ROA.504.

[164] *Caron*, 524 U.S. at 313; accord *United States v. Thomas*, 991 F.2d 206, 212–13 (5th Cir. 1993) ("Simply because those rights are reinstated automatically by operation of law, they are no less 'restored' than are such rights that have been resurrected by an 'affirmative act' of the state.").

This Court recognizes two kinds of automatic restoration: "a generalized restoration" of "all or essentially all of the civil rights of criminals," and a specific restoration of the three "key" civil rights "to vote, hold public office, and serve on a jury."[165] Louisiana provides general restoration through two constitutional mechanisms.

Article 1, Section 20 of the Louisiana Constitution provides: "Full rights of citizenship shall be restored upon termination of state and federal supervision following conviction for any offense." In *Dupaquier*, this Court has held that the "plain language" of this constitutional provision "fully restore[s]" civil rights for purposes of 18 U.S.C. § 921(a)(20).[166] Thus, under binding precedent, Mr. Reed's civil rights would have been restored as soon as he completed the sentence.

### 3. Louisiana automatically pardons all nonviolent first-time felony offenders.

Article 4 of Louisiana's Constitution separately provides for automatic *pardon* of first-time, non-violent offenders, without separate action by the state parole board or the governor.[167] This automatic pardon is separate from the general restoration of

---

[165] *Dupaquier*, 74 F.3d at 618.

[166] *Dupaquier*, 74 F.3d at 618 ("Under the plain language of the Constitution, therefore, Dupaquier's civil rights were fully restored upon his discharge from custody.").

[167] Article 4 of the Louisiana Constitution provides, in pertinent part:

> [A] first offender convicted of a non-violent crime, or convicted of aggravated battery, second degree battery, aggravated assault, mingling harmful substances, aggravated criminal damage to property, purse snatching, extortion,

civil rights for all felons in Article 1, and it provides an additional reason why the 2007 disposition should have been excluded. If the government's theory of the case were true, then Mr. Reed would have been *pardoned* by operation of state law as soon as he completed his sentence for possessing stolen things.

Resisting this conclusion, the government argued below that the first-offender pardon "was not extended to Reed."[168] That was an argument from silence: by statute, the Louisiana Department of Corrections is supposed to issue a certificate of pardon as soon as a first-time offender completes his first sentence, and is supposed to send that certificate to the defendant and the clerk of court.[169] The government could not find any certificate of pardon, and it refused to acknowledge that the certificate's absence provides (yet another) reason to doubt the government's theory. For Mr. Reed,

---

or illegal use of weapons or dangerous instrumentalities never previously convicted of a felony shall be pardoned automatically upon completion of his sentence, without a recommendation of the Board of Pardons and without action by the governor.

La. Const., art. 4, § 5(E)(1); *see also* La. Rev. Stat. Ann. § 15:572(B)(1).

[168] ROA.479.

[169] ROA.479 (discussing La. Rev. Stat. Ann. § 15:572(D)).

the absence of documentation meant the event did not happen. But for the government, an absence of documentation meant nothing. So the government decided that Mr. Reed was inexplicably denied what state law would have required.[170]

### 4. Louisiana automatically restores the specific right to vote when an offender satisfies a prison sentence or five years after parole begins.

Turning from the general to the specific, Louisiana also automatically restores the three key civil rights after a felony conviction. Louisiana suspends its citizens' right to vote while they are "under an order of imprisonment for conviction of a felony."[171] The right to vote is immediately restored upon satisfaction of the prison sentence or, in the case of someone who is "under" an imprisonment order but who is not actually incarcerated, five years after the release from incarceration.[172]

---

[170] It may be that the "parole" mechanism would require further inquiry into the specific language used in the parole letter. At least one member of the Court has written that the first-offender pardon letters Louisiana sent out in 2011 would have terminated the federal disability because they did not "expressly" forbid firearm possession. *United States v. Viola*, <u>768 F. App'x 238, 240</u> (5th Cir. <u>2019</u>) (Higginbotham, J., concurring). The Court did not address how § 921(a)(20) would apply to the pardoned conviction because the defendant did not argue the issue on appeal. *Id.*

[171] La. Const. art. 1, § 10(A); *see also* <u>La. Rev. Stat. Ann. § 18:102(A)(1)(A)</u>.

[172] <u>La. Rev. Stat. Ann. § 18:102(A)(1)(b)</u>.

**5. Before 2018, Louisiana restored the specific right to hold public office when the sentence was completed. Since 2018, that right is regained after five years.**

In 2018, Louisiana amended its constitution to disqualify convicted felons from holding public office.[173] Before that time, felons became eligible immediately upon completion of their sentence.[174] Even under the 2018 amendment, the right to hold public office is automatically restored five years after completion of the sentence.[175]

**6. Louisiana would have automatically restored the specific right to serve on a jury by August 2021, at the latest.**

Convicted felons lose the right to serve on juries in Louisiana, but that right is automatically restored (no more than) five years after release from incarceration and completion of probation or parole.[176] This was not always the case. Louisiana has amended its juror qualification statute twice since this Court addressed the provision in *Dupaquier*.

---

[173] La. Const., art. 1, § 10.1(A)(2).

[174] At one time, the Louisiana Constitution appeared to forbid felons from holding office for fifteen years. In 2016, the state supreme court held that no such amendment was ever adopted. *See Shepherd v. Schedler*, 209 So. 3d 752 (La. 2016).

[175] La. Const., art. 1, § 10.1(B).

[176] La. Code Crim. P. art. 401(A)(5) (eff. Aug. 1, 2021).

For many years—going back to at least 1967—Louisiana disqualified any potential juror who has "been convicted of a felony for which he has not been pardoned."[177] In *Dupaquier*, this Court recognized this disqualification, but held that the general restoration in Article I, Section 20 controlled for purposes of 18 U.S.C. § 921(a)(20).[178] In 2010, the state legislature disqualified those who had received a first-offender pardon: a potential juror must "(5) Not be under indictment for a felony nor have been convicted of a felony for which he has not been pardoned *by the governor*."[179]

In 2021, the legislature amended the law to its current form:

> A. In order to qualify to serve as a juror, a person shall ... (5) Not be under indictment, incarcerated under an order of imprisonment, or on probation or parole for a felony offense within the five-year period immediately preceding the person's jury service.[180]

In other words, any way you slice it, Mr. Reed's civil rights would have been fully restored by operation of multiple mechanisms of Louisiana law. Indulging every possible government-friendly inference drawn from Government Exhibits 21 and 22, that restoration would have happened long before August 2022.

---

[177] *See* La. Code Crim. P. art. 401(5) (1967).

[178] *See Dupaquier*, 74 F.3d at 618 ("[W]here, as here, a state's constitution declares full rights of citizenship to be restored upon a convicted felon's release from custody, we need not look further to determine that the restoration satisfies section 921(a)(20).").

[179] 2010 La. Acts No. 438 (eff. Aug. 15, 2010) (emphasis added).

[180] 2021 La. Acts No. 121 (eff. Aug. 1, 2021).

### D. The Court should vacate the conviction and allow the district court to correct this error.

If the district court had correctly interpreted § 921(a)(20), then many other decisions would have come out differently. Suppression of the 2007 Case is a big enough change, and would warrant reversal.

The same statutory error would also affect the analysis of the 2009 allegation. Mr. Reed never got a ruling from *anyone* about whether the 2009 Case would satisfy § 921(a)(20), as correctly interpreted. But he never contended that allegation was inadmissible as a matter of law. It is hypothetically possible that the government could have proven that the 2009 disposition was a *qualifying* conviction—it would just depend on when the sentence ended.

## II.   The jury instructions fell short.

### A. The standard of review is de novo.

When a defendant claims that a "jury instruction was improper because it did not correctly encapsulate the statutory requirements for a crime," review is de novo.[181] Otherwise, the standard of review is abuse of discretion.[182] The jury charge must be "a correct statement of the law" and should "clearly instruct[ ] jurors as to the principles

---

[181] *United States v. Harris*, 740 F.3d 956, 964 (5th Cir. 2014).

[182] *Hall*, 134 F.4th at 787 (citing *United States v. Hamilton*, 46 F.4th 389, 394 (5th Cir. 2022)).

of law applicable to the factual issues confronting them."[183] A district court abuses its

discretion if it refuses to give an instruction that:

> (1) was substantially correct, (2) was not substantially covered in the charge given to the jury, and (3) concerned an important issue in the trial so that the failure to give the instruction seriously impaired the defendant's ability to present a given defense.[184]

Mr. Reed preserved plenary review for each of the challenges below by requesting an appropriate instruction and objecting to the charge's omission of that instruction.

## B. The district court should have informed the jury about the federal pardon and restoration-of-rights rule.

When instructing the jury about second and third elements of the offense (status and knowledge), the district court used the phrase, "convicted in a court of a crime punishable by imprisonment for a term in excess of one year."[185] This language appears in this Circuit's pattern jury instructions,[186] and it is very similar to the words used in

---

[183] *Hall*, 134 F.4th at 757 (quoting *Hamilton*, 46 F.4th at 394).

[184] *United States v. Trevino*, 989 F.3d 402, 405 (5th Cir. 2021) (citing *United States v. John*, 309 F.3d 298, 304 (5th Cir. 2002)).

[185] ROA.710.

[186] Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 2.43D, p. 218 (2024).

§ 922(g)(1): "[A]ny person … (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." Normally, no further definition is needed.

But Congress defined that statutory language in a way that is not conveyed by the words alone. A lay juror might conclude on her own that a *pardoned* conviction doesn't count, but she would have no reason to know that postconviction *restoration of civil rights* could have that effect. Yet that is precisely what Congress said when defining "conviction":

> What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.[187]

Mr. Reed asked the court to convey the substance of this definition to the jury. He asked to tell the jury that while conviction of a crime punishable by more than one year in prison gives rise to a prohibition "in most cases," there is an exception for pardoned offenders or those who had their civil rights restored.[188] He also proposed

---

[187] 18 U.S.C. § 921(a)(20).

[188] ROA.465.

including the "unless clause."[189] The definition is critical to evaluating both the *status* element and the *knowledge* element. The district court denied his request.[190]

The government may try to defend that ruling by pointing to decisions describing the statutory exemption as a "legal question" for the court alone to resolve.[191] The government made that argument below, citing *United States v. Broadnax*.[192] Mr. Reed agrees with the government (and with *Broadnax*'s sixth footnote) that the proper interpretation of § 921(a)(20) "is often fraught with legal complexities that require parsing … state and federal statutes that define crimes," and that the task of statutory interpretation is "uniquely in the court's ken."[193] Thus, the decision of whether a particular state procedure *restores civil rights* or *proscribes the possession of firearms* under § 921(a)(20) falls firmly within the court's responsibility. For the reasons argued earlier, the district court erred when performing that task here.

---

[189] ROA.465.

[190] ROA.1526.

[191] *See*, e.g., *Broadnax*, 601 F.3d at 345 ("Accordingly, it was for the district court, not the jury, to determine whether any of Broadnax's prior convictions qualified as a 'crime punishable by imprisonment for a term exceeding one year' as that phrase is defined in § 921(a)(20).").

[192] ROA.883 (discussing *Broadnax*).

[193] *Broadnax*, 601 F.3d at 345 n.6; ROA.883-84.

But that does not mean that the trial judge can take over the jury's critical role in resolving *factual* disputes. Mr. Reed explained this below: "If the application of § 921(a)(20) and § 922(g)(1) depends on a disputed factual matter—such as when the defendant was released from imprisonment or when the defendant completed his sentence—then that matter must be submitted to the jury."[194]

If there was a question about whether a state's chief executive had, in fact, pardoned the defendant, that would be a question for the jury. If the paperwork accompanying that pardon had been lost or destroyed, and a defendant's guilt or innocence turned on *what the paper said* about his right to bear arms, then the jury would have to resolve the debate. And the same should be true here, where there is an alleged conviction that *might or might not be proven real,* and if it is real, *might or might not* satisfy the statutory definition of "convicted."

This Court's precedents do not hold otherwise. Decisions about § 921(a)(20) are usually resolved on the basis of stipulated (or at least undisputed) facts. In *Broadnax,* the defendant stipulated that he "had been convicted in a court for a crime punishable by imprisonment for a term exceeding one year, that is, a felony offense"; in other

---

[194] ROA.536 n.3 (citing *United States v. Gaudin,* 515 U.S. 506, 512 (1995); *Alleyne v. United States,* 570 U.S. 99, 103 (2013); and *Apprendi v. New Jersey,* 530 U.S. 466, 483 n.10, 490 (2000)).

words, "the language of the stipulation is identical to the language of § 922(g)(1)."[195]

In *United States v. Daugherty*, the defendant signed a stipulation of facts and *agreed to a bench trial*.[196] These cases do not overrule the jury's historic role in resolving factual disputes and mixed disputes of fact and law.[197]

## C. The district court should have instructed the jury about Louisiana's pardon and restoration rules.

To properly apply the status and knowledge elements in this case, the jury needed to know that Louisiana automatically restores a felon's civil rights, automatically pardons first-time felons, and (either immediately or eventually) restores a felon's ability to lawfully possess and carry firearms. Mr. Reed asked the district court to inform the jury about the relevant rules.[198] He objected to the court's charge because it did "not let the jury know about Louisiana's provisions of automatically restoring civil rights," which would be "necessary" to accurately adjudicate whether he had been "convicted."[199] He even proposed an instruction that would reflect the court's (erroneous) legal determination about concealed handgun licenses, while allowing him to

---

[195] 601 F.3d at 344, 346.

[196] *Daugherty*, 264 F.3d at 514.

[197] *See Gaudin*, 515 U.S. at 512–13.

[198] ROA.465, 657.

[199] ROA.1527.

argue as a factual matter that he made a reasonable mistake about a collateral question of law.[200] All these requests were denied and the objection was overruled.[201]

A federal jury in Fort Worth, Texas, would have no reason to know that Louisiana automatically pardons first-time felony offenders; that it automatically restores other felons' civil rights, either immediately or after a period of time; nor, critically, that Louisiana restores the right to possess firearms after a ten-year waiting period. Without those instructions, the jury did not have an opportunity to evaluate viable defenses under the trial evidence: that Mr. Reed was truly convicted in the 2007 Case, but not the 2009; that he was truly convicted in the 2009 case, but his civil rights were automatically restored and he completed the sentence more than ten years before the offense; or that he *believed* one or the other of those things.

### D. The court's instructions about felon status and knowledge deprived Mr. Reed of the chance to present viable *mens rea* defenses.

With a complex definition that turns on the interaction of arcane state and federal laws, mistakes are bound to happen. Fortunately, Congress criminalized only *knowing* violations of § 922(g).[202] In 2019, the Supreme Court held that the federal

---

[200] ROA.657.

[201] ROA.1526, 1528.

[202] 18 U.S.C. § 924(a)(8) ("Whoever knowingly violates subsection (d) or (g) of section 922 shall be fined under this title, imprisoned for not more than 15 years, or both.").

felon-in-possession crime requires proof that the defendant "knew he belonged to the

relevant category of persons barred from possessing a firearm."[203]

Here, the trial judge told the jury it would need to find:

> That the defendant knew he had been convicted in a court of a
> crime punishable by imprisonment for a term in excess of one
> year.[204]

As explained elsewhere in this brief, the "category of persons barred from pos-

sessing a firearm" does not include those who were previously "convicted" of a felony

offense but who later had their rights restored without any firearm restriction. A de-

fendant who *believes* he falls into the excluded class is not guilty, regardless of whether

that belief is true.

Mr. Reed's initial request accurately describes the governing law:

> To convict the defendant of the offense charged in the indictment,
> "the Government must prove both that the defendant knew he
> possessed a firearm and that he knew he belonged to the relevant
> category of persons barred from possessing a firearm."
>
> To act knowingly means that the act was done voluntarily and in-
> tentionally, not because of mistake or accident.
>
> An individual who mistakenly believes he is not within a prohib-
> ited class is not guilty of this crime. For example, a defendant who
> does not know that his prior crime was "punishable by imprison-
> ment for a term exceeding one year" does not have the guilty

---

[203] *Rehaif v. United States*, <u>588 U.S. 225, 237</u> (2019).

[204] <u>ROA.710</u>.

> knowledge necessary to convict. Likewise, "a defendant who gen-
> uinely but mistakenly believes that he has had his individual rights
> restored has a valid defense to a felon-in-possession charge."[205]

Nothing in the court's charge allows a defendant to argue that he believed his individual rights had been restored because of the lapse of time. Nothing in the charge allows a defendant to argue that he believed more than ten years had elapsed since he completed any sentence. Nothing in the charge allows a defendant to argue that, in the critical period exactly ten years before he was caught possessing a firearm, he was involved in another legal proceeding that would cause him to doubt that he was under a sentence, or within the prohibited class.

In order to preserve some semblance of these defenses, Mr. Reed's supplemental request proposed an instruction that would capture the district court's ruling about § 921(a)(20) while advising the jury about Louisiana provisions that are critical to a mistake involving a collateral question of law:

> Louisiana automatically pardons first-time felony offenders upon
> completion of their sentence if they have not been convicted of
> any other felonies. Louisiana automatically restores the civil rights
> of felony offenders to vote, serve on a jury, and hold public office
> five years after completion of their sentence. Louisiana automati-
> cally restores the right to possess a firearm under state law ten years
> after completion of any sentence. Even so, the federal prohibition
> against possession of a firearm continues to apply because, even
> after that restoration, a person convicted of a felony offense in

---

[205] ROA.466 (footnotes omitted).

Louisiana is ineligible for a statewide concealed handgun permit.[206]

He didn't insist on any specific language. At the charge conference, he proposed additional alternatives, including "he knew that he was still a felon," and "he had knowledge that he was a member of that prohibited class."[207] He asked for an instruction that would say he is not guilty if "he made a reasonable mistake as to whether his civil rights had been restored under Louisiana law."[208] The district court overruled all his objections and denied all of his requests.[209]

The differences between the court's charge and Mr. Reed's requests is most starkly illustrated when considering Defendant's Exhibit 13 (26y), which was part of a jail conversation with loved ones about whether he should plead guilty. Mr. Reed said,

> I thought that the past was old. So I'm not thinking I'm a convicted felon around a firearm. It's over 10 years ago. ... See, I'm thinking that 10 years, I don't have anything to worry about. I don't have to report it on job applications. It's from 2007. So I'm thinking, this is 2023.[210]

---

[206] ROA.657.

[207] ROA.1527.

[208] ROA.1528.

[209] ROA.1528.

[210] Defendant's Exhibit 13 (26y) (audio exhibit, with transcript).

With a proper understanding of federal and Louisiana law, a rational jury could have found that Mr. Reed sincerely believed that his individual rights had been restored. In *United States v. Trevino*,[211] this Court held (or strongly suggested) that this belief would negate the *mens rea* element:

> Thus, for instance, an individual who mistakenly believes he is not within a prohibited class—such as a "defendant who does not know that he is an alien 'illegally or unlawfully in the United States' "— "does not have the guilty state of mind that the statute's language and purposes require." [*Rehaif*, 588 U.S. at 235]; *see also United States v. Robinson*, 982 F.3d 1181, 1186 (8th Cir. 2020) (recognizing "[a]fter *Rehaif*, it may be that a defendant who genuinely but mistakenly believes that he has had his individual rights restored has a valid defense to a felon-in-possession charge").[212]

Whether Louisiana has sufficiently restored an offender's rights to lift the federal firearm prohibition is "a 'collateral' question of law."[213] Even if the answer is negative, the defendant's *belief* about "the legal effect" of the lapse of time "negates an element of the offense."[214]

---

[211] 989 F.3d 402 (5th Cir. 2021).

[212] *Trevino*, 989 F.3d at 405.

[213] *Rehaif*, 588 U.S. at 235.

[214] *Trevino*, 989 F.3d at 405 (quoting *Rehaif*, 588 U.S. at 234).

In the unique context of this case—where the government relies on allegations of Louisiana convictions allegedly imposed and sentenced more than ten years before the firearm possession, and where the trial evidence is silent about the end of the sentence—Mr. Reed was entitled to raise this defense.

But because the district court refused his requested instructions, the government was free to argue the exact opposite in closing. After rhetorically asking how the government could prove the *mens rea* element, the prosecutor argued:

> Because the defendant, in his jail calls, said that I wasn't thinking I was a convicted felon, and he talks about his 2007 conviction. So, he knew.[215]

> [...]

> His mistake of believing that the law is 10 years or 15 years, or because I don't have to put it on a criminal background check, mistake of law is no defense, otherwise, it would be in the Charge.[216]

### E. The court should have told the jury about Louisiana's requirement for memorializing a judgment of conviction.

Mr. Reed asked for the following jury instruction, which accurately summarizes the requirements of Louisiana Code of Criminal Procedure article 871.B:

> When a Louisiana court enters a judgment that a defendant is guilty of a felony, the sheriff shall cause to be attached to the bill of information or indictment the fingerprints of the defendant

---

[215] ROA.1577.

[216] ROA.1579.

against whom such judgment is rendered. The Sheriff must also certify that the fingerprints are the defendant's against whom the judgment is rendered, and must also certify the date the fingerprints were attached to the information or indictment.[217]

The government had the burden of proving felon status beyond a reasonable doubt. The only trial evidence tending to show a *conviction* or a *sentence* came in the form of compilations of computerized "Minutes Reports" from the East Baton Rouge Parish Clerk of Court.[218] Those documents do not exude reliability—unless you believe EBRP employed probation officers named "**"[219] and "N/A."[220]

When evaluating whether to believe the assertions in these compilations, especially without the benefit of any sponsoring witness who had personal knowledge of the compilation or procedures, the jury should have been told about Louisiana's mandatory mechanism of memorializing the fact of conviction and the identity of the person convicted. The *absence* of Mr. Reed's fingerprints on the back of the official, certified copies of the charging document casts some doubt on the assertions implied in Exhibit 21 and expressed in Exhibit 23 that he was truly convicted in those cases.

---

[217] ROA.656.

[218] ROA.1769-72, 1782-83.

[219] ROA.1770.

[220] ROA.1772.

## III.  Mr. Reed's conviction is incompatible with the Second Amendment.

### A.  Review is de novo.

This Court reviews constitutional challenges de novo.[221] Mr. Reed preserved plenary review by moving to dismiss the indictment,[222] renewing that motion on an "as-applied" basis at the close of the government's evidence,[223] and then seeking reconsideration in light of this Court's decision in *Diaz*.[224]

### B.  Felon-in-possession laws are constitutionally suspect.

#### 1.  Despite its young age, federal courts have often embraced the prohibition against felons possessing firearms.

The federal prohibition against felons' *possession* of firearms first appeared as "a last-minute Senate amendment" to a sprawling 1968 crime bill: "The Amendment was hastily passed, with little discussion, no hearings and no report."[225] About 30 years earlier, Congress banned interstate firearm transactions by people convicted of a few violent felonies, and expanded coverage to all felons in 1961. Yet the statute largely avoided serious constitutional scrutiny; throughout the 20th century, courts "found

---

[221] *Diaz*, 116 F.4th at 462 (citing *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003)).

[222] ROA.49-52; *see also* U.S. Const., amend. II.

[223] ROA.1465.

[224] ROA.732-47.

[225] *United States v. Bass*, 404 U.S. 336, 344 (1971).

no conflict between federal gun laws and the Second Amendment, narrowly construing the latter to guarantee the right to bear arms as a member of a militia."[226] In 1980, the Supreme Court went so far as to assert that felon bans "are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties."[227]

This Court's first opinion recognizing an individual right to keep arms asserted, "it is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms."[228] The decision cited "a handful of law review articles contending that Founding-era England and America excluded felons from the right to have arms."[229] These assertions turned out to be wrong: "Though recognizing the hazard of trying to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I."[230] In fact, between

---

[226] *United States v. Graves*, 554 F.2d 65, 66 n.2 (3d Cir. 1977) (discussing *United States v. Miller*, 307 U.S. 174, 178–82 (1939), and its progeny).

[227] *Lewis v. United States*, 445 U.S. 55, 65 (1980) (citing *Miller*).

[228] *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001); *see also id.* at 227 n.21.

[229] C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 696 (2009).

[230] *Id.* at 708; *see also* Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial* Ipse Dixit, 60 Hastings L.J. 1371, 1374 (2009) ("Indeed, so far as I can determine, no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms.").

1607 and 1815, "American law recognized a zone of immunity surrounding the privately owned guns of citizens."[231]

Following *Emerson*, and with the apparent support of dictum in *District Columbia v. Heller*,[232] this Court "repeatedly held that *Emerson* and [*United States v. Darrington*, 351 F.3d 632, 634 (5th Cir. 2003)] foreclose Second Amendment challenges to § 922(g)(1)."[233]

### 2. *Bruen* breathed new life into Second Amendment challenges, and the thinking around § 922(g)(1) is unsettled.

When the "plain text" of the Second Amendment covers an individual's conduct, "the Constitution presumptively protects that conduct."[234] To justify a regulation that burdens presumptively protected conduct, "the government must affirmatively

---

[231] Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 142 (2007) (reviewing the first fourteen states' codes).

[232] In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court wrote: "Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626.

[233] *Diaz*, 116 F.4th at 465 (citing *United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017); *United States v. Anderson*, 559 F.3d 348, 352 & n.6 (5th Cir. 2009); *United States v. Mares*, 402 F.3d 511, 516 (5th Cir. 2005); and *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004)); see also *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) ("Prior to *Heller*, this circuit had already recognized an individual right to bear arms, and had determined that criminal prohibitions on felons (violent or nonviolent) possessing firearms did not violate that right.").

[234] *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022).

prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[235] By adopting this new historical framework in *NYSRPA v. Bruen*, the Supreme Court revived the argument that § 922(g)(1) exceeds Congress's power (at least as applied in some cases).

## C. Under the *Bruen* and *Diaz* framework, this conviction violates the Second Amendment.

### 1. In *Diaz*, the Court upheld § 922(g)(1) when applied against someone convicted of a modern crime whose closest colonial analog was capital.

*Diaz* was this Court's first detailed examination of § 922(g)(1) under the *Bruen* framework. The Court first held that the analysis must focus on prior convictions that would satisfy 18 U.S.C. § 922(g)(1). Diaz had multiple misdemeanor convictions, "but those are not relevant for our purposes."[236] The same is true of the five misdemeanors described in paragraphs 30, 31, 33, and 34 of Mr. Reed's PSR.[237]

This Court also rejected the Government's reliance on other misconduct Diaz allegedly committed around the same time he violated § 922(g)(1).[238] In other words,

---

[235] 597 U.S. at 19.

[236] 116 F.4th at 458.

[237] ROA.1826, 1828.

[238] *See Diaz*, 116 F.4th at 462, 467.

the as-applied Second Amendment analysis does not care about misconduct commit-

ted at the same time as the § 922(g)(1) violation. Instead, the Government had to

prove that § 922(g)(1) was constitutional as applied to someone with Diaz's three spe-

cific prior felony convictions:

> Thus, the only relevant criminal convictions for our purposes are
> car theft, evading arrest, and possessing a firearm as a felon. To
> survive Diaz's as-applied challenge, the government must demon-
> strate that the Nation has a longstanding tradition of disarming
> someone with a criminal history analogous to this.[239]

Assuming, for purposes of this argument, that the Government proved both of

the alleged convictions here, and that both were qualifying "convictions" under

§ 921(a)(20), the Government must now "demonstrate that the Nation has a

longstanding tradition of disarming someone with a criminal history analogous to

this" to survive Mr. Reed's as-applied challenge.[240] The Government cannot satisfy its

burden here.

*Diaz* recognized that "possessing a firearm as a felon—one of Diaz's three predi-

cate convictions justifying the application of § 922(g)(1)—was not considered a crime

until 1938 at the earliest."[241] In other words, § 922(g)(1)'s earliest progenitor is *younger*

---

[239] *Diaz*, 116 F.4th at 467.

[240] *Id.*

[241] 116 F.4th at 468 (citing the Federal Firearms Act, 52 Stat. 1250, 1250–51 (1938), and An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87–342, § 2, 75 Stat. 757 (1961)).

*than* the Sullivan law struck down in *Bruen*. This seems like good evidence that § 922(g)(1) is unconstitutional, but this Court didn't go that far.

Even without a historical firearm ban comparable to § 922(g)(1), *Diaz* held that the statute could be constitutionally applied against someone whose predicate convictions would have been punishable by death or by estate forfeiture at the Founding. The defendant had a prior conviction for felony vehicle theft.[242] Because "the closest colonial-era analogue to vehicle theft" was theft of a horse—and because that was a capital offense—*Diaz* held that § 922(g)(1) could be constitutionally applied. Early laws punishing larceny of goods and horse-stealing with death "establish that our country has a historical tradition of severely punishing people like Diaz who have been convicted of theft."[243]

## 2. At the Founding, receipt or possession of stolen items was (at most) a misdemeanor.

Louisiana distinguishes between theft—i.e., the actual taking of another person's property—and the mere possession of stolen items. "Illegal possession of stolen things" is "the intentional possessing, procuring, receiving, or concealing of anything of value which has been the subject of any robbery or theft, under circumstances which

---

[242] 116 F.4th at 467.

[243] 116 F.4th at 468–69.

indicate that the offender knew or had good reason to believe that the thing was the subject of one of these offenses."[244]

Like modern-day Louisiana, English and early American jurisdictions distinguished between larceny and receipt of stolen property. Larceny was (at least sometimes) "considered a felony at the time of the Founding and was punished accordingly."[245] This Court's "own research reveals that those convicted of horse theft—likely the closest colonial-era analogue to vehicle theft—were often subject to the death penalty."[246]

At common law, conviction for larceny required identification, apprehension, and prosecution of the person who actually took the goods. In many cases, authorities could not identify or prosecute the thief. Without a principal, no one could be convicted as an accessory-after-the-fact. For that reason, English authorities developed a separate misdemeanor crime of receiving or buying stolen property.[247]

American jurisdictions at the Founding followed England's lead. For example, a 1769 South Carolina statute distinguished between burglars, accessories, and those

---

[244] La. Rev. Stat. § 14:69.A (2007).

[245] *Diaz,* 116 F.4th at 468.

[246] *Id.*

[247] 5 William Blackstone, *Commentaries on the Law of England* 38, 132–33 & n.132–33 & n.13 (St. George Tucker ed., 1832) ("Tucker's Blackstone").

who merely received or bought goods that had been "feloniously taken" in a burglary or a house-breaking.[248] A person convicted of buying the stolen goods was guilty of a misdemeanor.[249] Pennsylvania followed suit in 1790,[250] Virginia in 1792,[251] and New Jersey in 1796.[252] All these jurisdictions allowed prosecutions for possessing or receiving stolen goods *without* a simultaneous conviction of the thief.

In other words, people convicted of "the closest colonial-era analogue"[253] to possession of stolen things were never sentenced to death or estate forfeiture; the crime was historically a misdemeanor. This historical tradition of imposing misdemeanor punishment for those who knowingly accept stolen goods does not serve as an analogue for 18 U.S.C. § 922(g)(1)'s life-long ban on possession of firearms.

---

[248] *See* Act of Aug. 23, 1769 (No. 981), in 4 S.C. Statutes at Large 306–308 (A.S. Johnston ed. 1838); *State v. Sanford*, 10 S.C.L. (1 Nott & McC.) 512, 514 (S.C. Const. App. 1819).

[249] 4 S.C. Stat. 307 (1838).

[250] Act of April 5, 1790, § 4, in 13 Penn. Stat. 513–14 (1908 ed.).

[251] Act of Dec. 26, 1792, paragraph IV, in 1794 Va. Acts, ch. 109, p. 216 (Augustine Davis ed. 1794); William W. Hening, The New Virginia Justice 6 (T. Nicholson ed. 1795).

[252] Act of Mar. 18, 1796, § 62, in N.J. Laws 219–20 (William Patterson ed. 1800).

[253] *Diaz*, 116 F.4th at 468.

### 3. There is no Founding-era crime analogous to attempted entry into an inhabited dwelling.

The Government also alleged that Mr. Reed was convicted of attempted entry of an inhabited dwelling in the 2009 Case. There is no Founding-era analogue for this crime.

First, the inchoate crime of "attempt" did not yet exist at the Founding. The crime simply "did not exist in early English law."[254] Some specific crimes like bribery or assault included attempt-like elements, but there were no general prohibitions against attempting another crime. When Blackstone wrote the criminal-law volume of his Commentaries in 1769, he did not mention any crime like "attempt."[255]

The concept of criminal "attempt" apparently first appeared in the English case *Rex v. Scofield*, Cald. 397 (1784).[256] The concept apparently was unknown on this side of the Atlantic before the 1820s.[257]

Second, at the Founding, unauthorized entry into someone else's house was (at worst) a civil trespass. As with the inchoate crime of attempt, there is scarce evidence

---

[254] Wayne R. LaFave, 2 Subst. Crim. L. § 11.2(a) (3d ed. 2020).

[255] *See* Francis B. Sayre, *Criminal Attempts*, 41 Harv. L. Rev. 821, 834 n.51 (1928).

[256] *See Cherry v. State*, 306 A.2d 634, 637 n.1 (Md. App. 1973) (crediting "the creative genius of Lord Mansfield in *Rex v. Scofield*"); *see also* Sayre, *supra*, at 834–35 (discussing *Scofield* and *Rex. v. Higgins*, 102 Eng. Rep. 269, 2 East. 5 (1801)).

[257] *See State v. Avery*, 7 Conn. 266, 270–71 (1828).

that this would be considered a crime anywhere in America during the Founding, and it certainly was not a capital crime or one resulting in complete loss of estate.

The Government may say this crime is analogous to burglary, but that is wrong. At common law, and in most American jurisdictions today, "burglary" requires proof of a specific intent to commit some other offense inside the premises.[258]

Early American cases involving residential trespass typically arose under common law, rather than statutes. At and immediately after the Founding, "most of the states ... had common law crimes."[259] "Trespass was not a crime at common law, however, unless it was accompanied by or tended to create a breach of the peace."[260] The "civil" nature of residential trespass under English common law is most vividly illustrated by the curious case of Michael Fagan, who broke into Buckingham Palace two times and, on the second occasion in 1982, surprised the Queen in her own bedroom:

---

[258] *See* 5 Tucker's Blackstone 227 ("As to the intent; it is clear, that such breaking and entry must be with a felonious intent, otherwise it is only a trespass.").

[259] 1 LaFave, *supra*, § 2.1(c).

[260] *People v. Goduto*, 174 N.E.2d 385, 387 (Ill. 1961); *see also* 3 LaFave, *supra*, § 21.2.

"Palace spokesmen explained that [Fagan] had done nothing more serious than tres-

passing on private property, which in Britain is a violation of civil law but not a

crime."[261]

Early American cases confirm that trespass inside a home (without more) was

treated as a civil or private wrong:

> But we find no authority for the position that a mere trespass upon
> the dwelling house, short of a violent taking or withholding of the
> possession thereof, is per se an offence against the community. If
> committed under such circumstances as necessarily involve a
> breach of the public peace, or have an immediate tendency to pro-
> voke it, then the act may rise from a private to a public wrong.[262]

Even the civil tort of trespass was limited at the Founding: "In no reported eighteenth

century case did a landowner sue an unauthorized intruder merely for intruding—the

modern meaning of trespass."[263] In *Commonwealth v. Taylor*, 5 Binn. 277, 279–285

(Penn. 1812), the defendant "unlawfully, secretly, and maliciously, with force and arms,

broke and entered at night the dwelling house" of another person, and then raised a

---

[261] R.W. Apple, Jr., *Palace Intruder Is Acquitted by London Jury*, N.Y. Times, Sept. 24, 1982, at A13, online at https://www.nytimes.com/1982/09/24/world/palace-intruder-is-acquitted-by-london-jury.html.

[262] *State v. Fort*, 20 N.C. (3&4 Dev. & Bat.) 332 (1839).

[263] Brian Sawers, *Original Misunderstandings: The Implications of Misreading History in Jones*, 31 Ga. St. U.L. Rev. 471, 492 (2015).

ruckus so loud that it frightened one of the residents and she miscarried. The Pennsylvania Supreme Court allowed prosecution for "malicious mischief," a misdemeanor, but also explained, at some length, why the defendant could not be indicted for criminal trespass.

That is not to say that there were no criminal prosecutions involving residential trespass. At common law and in many early American jurisdictions, "breach of the peace" could be punished as a petty or misdemeanor offense. And thus, trespasses accompanied by a breach of the peace could sometimes be punished as a petty crime or a misdemeanor.

But Mr. Reed's attorneys have searched and found no examples of someone convicted and punished as a felon for merely entering a home without permission. It was not a felony, and it certainly was not capital. Thus, under the binding logic of *Diaz*, 18 U.S.C. § 922(g)(1) would violate the Second Amendment as applied to Mr. Reed—even if the Court accepts all the Government's allegations as true.[264]

In any case, Mr. Reed never suffered conviction for unauthorized entry, only for *attempted* unauthorized entry. As discussed above, there was no such crime at the

---

[264] *See Diaz*, 116 F.4th at 468 ("The fact that Diaz is a felon today, then, does not necessarily mean that he would have been one in the 18th century.").

Founding, and certainly no crime that would lead to life-long consequences comparable to or worse than § 922(g)(1)'s permanent ban on keeping firearms.

Mr. Reed acknowledges that two post-*Diaz* decisions have suggested that § 922(g)(1) may be constitutionally applied against anyone with a "theft-related" felony conviction, but both involved convictions for *robbery*,[265] which is both violent and historically capital.[266]

Fidelity to *Diaz* and *Bruen* requires a different outcome here. Taking all the government's allegations as true, Mr. Reed was convicted of two non-violent, non-dangerous felonies that were neither capital nor felonious at the Founding. One of the crimes—Possessing Stolen Things with a value of less than $500—became a misdemeanor *while* the case was pending.[267]

---

[265] *See United States v. Branson*, 139 F.4th 475, 477 (5th Cir. 2025); *United States v. Schnur*, 132 F.4th 863 (5th Cir. 2025).

[266] If anything, *Diaz* rejects the view that anything "theft-related" would justify a life-long firearm ban. The Court relied heavily on then-Judge Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437, 451–69 (7th Cir. 2019) (Barrett, J., dissenting), which persuasively argued in favor of a dangerousness standard and against the constitutionality of life-long disarmament for a defendant who tricked the government into paying him $375,000.

[267] *See* 2010 La. Acts No. 585, § 1.

## IV. Section 922(g)(1), as applied in this case, exceeds Congress's affirmative powers as originally understood.

Under the statutory reasoning of *Scarborough v. United States*,[268] , Mr. Reed's possession of his mom's gun within his apartment affected commerce because the firearm was manufactured elsewhere and traveled through other states before she bought it in Texas. Properly understood, the 1986 amendments to § 922(g) call for a different interpretation of the nexus element for possession. Congress combined the *possession* and *receipt* offenses into a single paragraph, but utilized different language for nexus-with-commerce (I.e., to "possess *in or affecting commerce*, any firearm" versus "to receive any firearm or ammunition *which has been shipped or transported in interstate or foreign commerce*"[269]). Under the prevailing interpretation, those terms are assumed to be synonymous—so much so that the indictment here charges *possession* of a firearm that "traveled in and affected interstate or foreign commerce."[270] At the most basic level of English grammar, the statutory phrase "in or affecting commerce" must modify *possess*, not *firearm*.

---

[268] [431 U.S. 563](#) (1977).

[269] [18 U.S.C. § 922(g)](#) (emphasis added).

[270] [ROA.40](#).

If that is wrong—if the Government's proof about interstate movement of Freida Reid's gun *before she bought it* in February 2021 meant that her son's possession in August 2022 was somehow "in" or "affecting" commerce—then the nexus element does nothing to ensure, on a case-by-case basis, that Congress acted within its constitutional power.

Congress's power to regulate "Commerce with foreign Nations, and among the several States,"[271] does not include regulation of a purely local, non-economic activity like firearm possession.[272] The movement of a durable item like a firearm from one state to another may be "commerce," but the item does not remain "in commerce" forever. There is "no better example of the police power, which the Founders denied the National Government and re-posed in the States, than the suppression of violent crime and vindication of its victims."[273]

This Court or the Supreme Court should review and correct the prevailing interpretation of the statutory nexus-with-commerce element and Congress's associated constitutional power. The founding generation did not believe they were creating a national government with the power to veto a state's choices about who could and

---

[271] U.S. Const., art. I, § 8.

[272] *United States v. Lopez*, 514 U.S. 549, 560 (1995).

[273] *United States v. Morrison*, 529 U.S. 598, 618 (2000).

who could not keep and bear arms. They granted Congress only limited powers, established a federalist system of government, and passed the Tenth Amendment at the same time as the Second. Given everything that happened below,[274] this would be an appropriate case to reconsider the prevailing constitutional and statutory understandings. But Mr. Reed concedes that, for the time being, these challenges are foreclosed.

## Conclusion

This Court should vacate the judgment of conviction.

Respectfully submitted,

Jason D. Hawkins
Federal Public Defender for the
Northern District of Texas

*/s/ J. Matthew Wright*
Assistant Federal Public Defender
Texas Bar No. 24058188
600 South Tyler Street
Suite 2300
Amarillo, Texas 79101
Telephone:  (806) 324-2370
Matthew_Wright@fd.org

*Attorneys for Mr. Reed*

---

[274] *See*, e.g., ROA.716 (jury note seeking clarification on the temporal aspect of nexus element)

**Certificate of Service**

I filed this corrected brief as an attachment to a motion for leave via the Court's ECF system on July 17, 2025. Opposing counsel, a registered filer, is deemed served.

/s/ J. Matthew Wright

**Certificate of Compliance**

This brief contains 15,044 words, exclusive of exempted portions. The Court already granted leave to file an overlength brief.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Goudy Old Style font.

/s/ J. Matthew Wright